## THE MICHAEL TRACY.

### In re M. & J. TRACY, Inc.

District Court, S. D. New York.

Sept. 3, 1929.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for petitioner M. & J. Tracy.

William F. Purdy, of New York City, for claimants Northwestern Fire & Marine Ins. Co. and other cargo underwriters.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and

Edmund F. Lamb, both of New York City, of counsel), for the Thames Line.

Joseph Banner, of New York City (K. F. Dwyer, of New York City, of counsel), for claimant Galvin.

WOOLSEY, District Judge.

■ My decision in this case is that the Michael Tracy was not to blame for the collision and, consequently, that her owner, the petitioner, is entitled to a decree of exoneration from all liability, with costs. ·

On February 5, 1927, at about 4:47 p. m. the steel steamship Michael Tracy came into collision with the wooden steamship Cape Cod in Hell Gate, East River, and as a result of the collision the Cape Cod was sunk.

At the time of this collision the dredge Governor Warfield with the scow A50 fastened to her westward side was engaged in a dredging operation on a contract with the United States government at Middle Reef near Mill Rock, in Hell Gate. This left a channel between the Astoria shore and the dredge approximately 600 feet wide.

It was in this channel at a point about one hundred and fifty feet off the dredge and about opposite to her that the collision occurred.

The collision occurred in daylight, the visibility was good, there was a moderate northerly wind. The weather conditions were, therefore, not unusual in any respect. The tide was running ebb at a rate of about three knots an hour through Hell Gate.

The Michael Tracy was coming down the river, in ballast, from Luysters Creek, Astoria, on the way to Hampton Roads.

The Cape Cod was proceeding up the river from Pier 32, East River, with cargo for Connecticut ports.

Those on board the Michael Tracy first observed the Cape Cod when the Michael Tracy had reached a point to the northward of and about 400 feet off Hallet's Point.

At this time the Cape Cod was between two and three hundred feet off the Astoria shore and about opposite the ferry slips at the lower end of Astoria Point.

At this time and in this relative position, the vessels exchanged a one blast signal.

The Michael Tracy then starboarded in order to round Hallet's Point, and was planning to pass about 200 feet to the eastward of the dredge Governor Warfield. The Cape Cod continued her course up the river.

If the vessels had continued on their respective courses they would have passed each other safely, port to port, with a distance of between 100 and 200 feet between them.

The Cape Cod was making about ten knots per hour through the water. With the three knot ebb tide against her, therefore, she was making about seven knots an hour over the ground.

The Michael Tracy was going at half speed, about six knots, through the water, and with the tide was making about nine knots over the ground.

The vessels were therefore approaching each other at a rate of at least 1600 feet a minute.

When they were between five and six hundred feet apart and still on their respective courses, the Cape Cod, which was then at a point a little below the dredge, took a sudden sheer and swung six or seven points to port. This sheer was due to the sudden disablement of the Cape Cod's gear. Why it gave out and what happened to it are matters of surmise, for the Cape Cod sunk before any examination could be made, and has not been raised.

When the Cape Cod took this sheer to port she blew a two-blast signal. The captain of the Michael Tracy replied with two blasts for, although he regarded a collision as then probably inevitable, he saw that the only possible chance was for him to try to pass the Cape Cod on her starboard side.

The Michael Tracy's helm at once was put hard astarboard, her engines were stopped, put at once full speed astern, then ahead for a few revolutions to try to throw her bow faster to port, then full speed astern again.

These manoeuvres, although promptly executed, proved ineffectual to prevent the collision although they undoubtedly changed the angle of the contact.

I find that the Michael Tracy did everything she could have been expected to do in the emergency with which she was thus suddenly confronted. If she made any mistakes in her signals or her maneuvers they were errors in extremis.

When the Cape Cod sheered and those in charge of her found that they could not break her sheer with her helm, a signal was given to the engine room for full speed astern. At the rate she was going, seven knots over the ground, before the effect of her reversed engines could have been felt she would have proceeded, allowing for the tide against her,

at least 150 or 200 feet. Admittedly at the time of the collision she had swung six or seven points to port from her previous course. The tide at that point in Hell Gate sets towards the place where the dredge was lying and would affect both vessels as soon as they started to lose their way.

I find, therefore, that the Cape Cod sheered across the Michael Tracy's course and that the collision occurred between 150 and 200 feet off the dredge and about opposite to her.

The Michael Tracy struck the Cape Cod a little abaft her starboard bow.

The angle of the collision was about thirty degrees between the starboard sides of the two vessels.

The vessels were held together for a short time by the Michael Tracy's putting her engines ahead. They drifted down with the tide and finally separated at a point six or seven hundred feet down stream from the dredge. Then the Cape Cod sank bow first.

[2] The principal fault claimed against the Michael Tracy is that she was a west-bound steamer under her own steam and passed to the eastward of the dredge contrary to regulations lawfully made by the Secretary of War under authority given to him by section 7 of the River and Harbor Act of August 8, 1917 (33 USCA § 1).

On March 12, 1924, under that act, the Secretary of War had passed regulations for navigation in the vicinity of Hell Gate during the operations which were being conducted in behalf of the government at Middle Reef, near Mill Rock.

No. 7 of these regulations provided that: "During the continuation of the work on Middle Reef * * * west bound steamers proceeding under their own steam, or under their own steam assisted by tugs alongside, shall pass between the dredge plant on Middle Reef and Mill Rock or to the westward of Mill Rock."

The claimants contend that this constituted a local traffic regulation for navigation in Hell Gate, and to that extent superseded the Inland Navigation Rules.

They may be right in this contention, but I do not decide it, because I think that the Michael Tracy's presence in the channel between the dredge and the Astoria shore was not in any legal sense a cause of the collision. Her presence there did not in any way hamper or affect the navigation of the Cape Cod before she took her sheer to port; after the sheer the Cape Cod was unmanageable.

I find that this sheer was the sole cause of the collision, and therefore the claimants have failed to prove any fault on the part of the Michael Tracy.