ZOERCHER ET AL. *v.* INDIANA ASSOCIATED
TELEPHONE CORPORATION

[No. 26,811. Filed April 2, 1937.]

*Omer S. Jackson,* Attorney-General, and *Urban C. Stover,* Deputy Attorney-General, for appellants.

*Stuart, Stuart & De Vol,* and *Cable G. Ball,* for appellee.

HUGHES, J.—This is an action by the appellee for a declaratory judgment to determine its rights and liabilities under the Intangibles Tax Law of Indiana. It appears from the complaint that in 1932 and prior to the enactment of the General Intangibles Tax Act, appellee issued its First and Refunding 6% Gold Bonds, Series A, the same being secured by indenture of mortgage. The mortgage contemplated that additional series of bonds might be issued. In the early part of 1936, appellee executed and issued a series of bonds dated October 1, 1935, and known as First Mortgage 4½% Bonds, Series B, due October 1, 1965, secured by said mortgage as supplemented by a certain supplemental indenture. The litigation here involved is with reference to Series B Bonds.

The State Board of Tax Commissioners determined that the appellee was liable for intangibles tax for the exercise of the privilege of issuing intangibles. The appellee paid, under an escrow agreement, the amount claimed to be due as intangible tax and asks in its complaint, that the money be returned to it on the theory that it was not subject to any intangible tax. The appellant filed a demurrer to the complaint of appellee which was overruled. The court made a special finding of facts and the conclusions of law were in favor of the appellee and judgment was rendered for the appellee. The errors relied upon for reversal are as follows:

1. The court erred in overruling the demurrer to the complaint.

2. The court erred in its conclusions of law upon the special findings of facts.

3. The court erred in its conclusions of law Number 1, 2 and 3.

It is not necessary to set out all of the special findings

of facts. In special finding number 6, it was found that the appellee applied to the Public Service Commission of Indiana for permission and authority to issue its said "First Mortgage 4½% Bonds, Series B, due October 1, 1965" and to execute a supplemental indenture, and on November 29, 1935, the appellee was authorized and permitted by the said commission to issue three million dollars ($3,000,000.00) of said bonds, dated October 1, 1935, to be negotiated and sold at not less than 98% of the par value thereof and was authorized to execute a supplemental indenture of trust.

In special finding number 8, it was found that in the month of March, 1936, the appellee signed, executed and issued said bonds of Series B and sold the same. That said bonds were authenticated by the signature of The First National Bank of Chicago, as Trustee, and that said bonds of Series B were signed on behalf of appellee, by its authorized corporate officers at Chicago, Illinois, and were then and there delivered by appellee to The First National Bank of Chicago, at its office in the City of Chicago, State of Illinois, for authentication by said bank as trustee and were there authenticated by said trustee.

In finding number 10, it is found that the bonds were sold to different parties at Chicago, Illinois, and were delivered by the appellee to said purchasers at Chicago, and were there paid for by said purchasers and that said purchasers were not, nor were any of them at such time, residents or domiciled, in the State of Indiana. It is further found in finding number 12 that the appellee did not, prior to or at the time of the signing, executing and issuing of said bonds of Series B, or at the time of the sale and transfer thereof, affix thereto, adhesive stamps required by Ch. 81, Acts 1933 of the General Assembly of the State of Indiana, in the case of intangibles subject to taxation under that Act, commonly called Indiana

Intangible Stamps, nor did appellee affix said stamps to the supplemental indenture, nor did appellee pay by registration as provided by Sec. 14 of said Act, or in any other manner, any intangibles tax under said Ch. 81, on said bonds or on account of the signing, executing and issuing thereof, or the sale and transfer of said bonds as aforesaid.

In finding number 13, it was found that because of doubts existing as to the liability of appellee for the tax imposed under said Act, the appellee was unable to sell said bonds for their fair value, unless it paid or provided for payment of the tax, which would accrue and be assessable against appellee if the provisions of said Act were held applicable to it. That in order to sell said bonds, the appellee was compelled to and did on March 13, 1936, deposit with the defendants, as members of and constituting the State Board of Tax Commissioners, in escrow, the sum of seventy-five hundred dollars ($7,500.00), said sum to be returned to appellee in the event it established it was not liable for the payment of said tax. The court stated three conclusions of law upon the special findings of facts, as follows:

1. That the law is with said plaintiff.

2. That said plaintiff is not liable for the payment of any tax under Ch. 81, Acts 1933 of the General Assembly of the State of Indiana, on account of the signing, executing and issuing of said bonds, designated as First Mortgage 4½% Bonds, Series B, due October 1, 1965, nor on account of sale and transfer thereof, nor on account of the execution of the supplemental indenture securing said bonds, dated October 1, 1935.

3. That the plaintiff is entitled to have returned to it, the sum of $7,500.00 deposited by plaintiff in escrow with said defendants, Philip Zoercher, Albert F. Walsman and Gaylord S. Morton, as members of and consti-

tuting the State Board of Tax Commissioners of the State of Indiana.

It is the contention of the appellants that sub-section (a) of Sec. 2 of the Intangibles Tax Act imposes a tax on the right to exercise the privilege of signing, executing and issuing intangibles and therefore the appellee is liable for the tax. The appellee insists that the tax is imposed by the statute only on the owner of intangibles domiciled in the State of Indiana, and the appellees further assert that if the General Intangibles Tax Act does impose a tax on the issuer of intangibles, it does not apply to intangibles signed, authenticated and issued outside of the State of Indiana. The appellee also submits the proposition that as a public utility, it was compelled to and did pay into the State Treasury of Indiana, through the Secretary of Public Service Commission, a tax of $7,500 under the Public Service Commission Act on account of the issuance of the bonds in question, and therefore, if an intangible tax be due from appellee, its liability was discharged by the payment of the said $7,500 into the treasury for the benefit of the general fund.

The first question presented and considered is this: Does the General Intangible Tax Act impose a tax upon the issuer of intangibles? If the answer to this question is in the negative, then it is not necessary to consider any other question presented in this case.

Sec. 2 of the General Intangibles Act (Acts 1933, ch. 81, p. 523, §15900 Baldwin's 1934) provides:

> "On and after the passage of this act, every person residing in and/or domiciled in this state, shall pay a tax to the State of Indiana at the rate and in the manner provided in this act, for the right to exercise any one or more of the following privileges: (a) Signing, executing and issuing intangibles."

The appellants contend that this sub-section (a) makes

the issuer of intangibles subject to the tax. If this subsection stood alone, the appellants would have strong reason for the contention, but it does not stand alone and it must be construed with all the other provisions of said Sec. 2 and with all other sections of the act. The whole act must be construed together in order to determine the meaning of the act and the intent of the legislature.

The purpose of interpretation of statutes is to ascertain the true intent of the legislature in enacting them. *Gilson* v. *Board of Com'rs. Rush Co.* (1891), 128 Ind. 65, 27 N. E. 235; *State* v. *Weller* (1908), 171 Ind. 53, 85 N. E. 761; *Hyland* v. *Rochelle* (1913), 179 Ind. 671, 100 N. E. 842. And when the legislative intent is ascertained, it must be given effect if it is not violative of the constitution. *Moore-Mansfield Constr. Co.* v. *Indianapolis N. & T. Railroad Co.* (1913), 179 Ind. 356, 101 N. E. 296; *Penn. Co.* v. *Mosher* (1911), 47 Ind. App. 556, 94 N. E. 1033. It is also a rule of statutory construction that words of a statute will be construed in accord with the apparent legislative intent, even though their exact and literal meaning would not warrant such construction. *State ex rel. Devening* v. *Bartholomew* (1911), 176 Ind. 182, 95 N. E. 417. In this case the court quoted with approval the following from *Clare* v. *State* (1879), 68 Ind. 17, 25:

"We do not understand that this court is bound, in the interpretation and construction of a statute, to take the words used therein in their plain, exact and literal sense. On the contrary, the true rule is, and always has been, as recognized in many decisions of this court, to make the legislative intention in the enactment of the particular statute, the chief guide of the court in its interpretation and construction. If the object, purpose and intention of the legislature, in the enactment of the particular statute, can be fairly ascertained and arrived at, then it is the duty of the court to overlook and disregard all apparent

inaccuracies and mistakes in the mere verbiage or phraseology of the statute, and, if, possible, to give force and effect to the evident reason, spirit and intention of the law. This, we think, is the true and only safe rule for the guidance of the courts in all statutory exposition and construction, and as such it has been recognized and acted upon by this court, in a large number of its reported decisions."

In 2 Lewis's Sutherland, Stat. Constr. (2d Ed.) Sec. 348, we find the following language: "Not only may the meaning of words be restricted by the subject matter of an act or to avoid repugnance with other parts, but for like reasons they may be expanded. The application of the words of a single provision may be enlarged or restrained to bring the operation of the act within the intention of the legislature, when violence will not be done by such interpretation to the language of the statute." In Endlich, Interp. of Stat., Sec. 73, it is said: "The words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object which the legislature has in view." It is also said in 2 Lewis's Stat. Const. (2d Ed.) Sec. 347, "When the intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such intention. . . . The inquiry, where any uncertainty exists, always is as to what the legislature intended, and when that is ascertained, it always controls." In the case of *Arnett* v. *State ex rel.* (1907), 168 Ind. 180, 188, 80 N. E. 153, it said, "It is a fundamental rule of statutory construction that it is the intent or spirit of an enactment, rather than its letter, which is to govern. A construction will not be adopted which leads away from the true intent." The intent of the legislature should be given effect, though the strict letter of the statute may not be followed. *Penn. Co.* v. *Mosher, supra.* And ". . . the legislative intention, as col-

lected from an examination of the whole, as well as the separate parts, of a statute, will prevail over the literal import of particular terms, and will control the strict letter of the statute, where an adherence to such strict letter would lead to injustice, to absurdity, or to contradictory provisions." *Stout* v. *The Board of Com'rs.* (1886), 107 Ind. 343, 347, 8 N. E. 222. In the case of *Cooper* v. *Metzger* (1881), 74 Ind. 544, 550, 551, it is said: "The intention of legislators and the purpose of a statute ought not to be made to yield to one or more phrases, when the whole act evinces a different intention and purpose. . . . We are to look, not to isolate clauses, but to the entire statute, to ascertain the legislative intention."

With the foregoing rules of statutory construction in mind, we will examine the different sections of the act, and the whole act, to ascertain the intent of the legislature. It must be conceded that the general purpose of the act in question was to find a more effective method of reaching intangibles owned by persons for the purpose of taxation, for the reason that the property tax law had become ineffective in reaching this class of property. It is said in the case of *Lutz* v. *Arnold* (1935), 208 Ind. 480, 506, 193 N. E. 840:

"We think the history of the adoption of the act in question is a matter of common knowledge. It was known to every taxpayer and the members of the General Assembly, that the greater part of all intangibles were escaping taxation. Owners of intangibles did not give them in for taxation. They satisfied their conscience in failing to give them in to the assessor for the reason they knew that their neighbors did likewise, and through the course of years it became the practice by the great majority of of the owners of intangibles to apparently forget they owned them. Prior to the enactment of the present act, it is estimated by the taxing authorities, that less than 5 per cent. of the intangible wealth of the state was given in for taxation. This condition, relative to taxation, became intolerable. Owners of

intangibles became perjurers in self-protection, because the rate of taxation in many instances exceeded the gross return on the same."

At the time the act was passed, and since then, it has generally been conceded that the tax was to be paid by the owner of the intangibles. This was the opinion of the State Board of Tax Commissioners of Indiana. In a pamphlet prepared by said board on the intangible tax act, with questions, answers, forms, rules and regulations, the board on page 8 under Sec. 2 of the act, stated "the tax is paid by the holder of the intangible." And the Attorney-General of the State of Indiana gave as his opinion that it was the owner of the intangible who was subject to the tax. Opinions of Attorney-General 1934, p. 422. While, of course, the opinion of the State Tax Board and the Attorney-General are not controlling, the practical construction of a statute is influential. *State ex rel.* v. *Billheimer* (1912), 178 Ind. 83, 96 N. E. 801. In the case of *State ex rel. Michener* v. *Harrison et al.* (1888), 116 Ind. 300, 307, 19 N. E. 146, it is said: "And so, the practical construction given to a statute by the public officers of the State, and acted upon by those interested, and by the people, is to be considered in cases of doubt."

Part of Sec. 2 of the act in question is as follows:

"On and after the passage of this act, every person residing in and/or domiciled in this state, shall pay a tax to the State of Indiana at the rate and in the manner provided in this act, for the right to exercise any one or more of the following privileges:

(a) Signing, executing and issuing intangibles.

(b) Selling, assigning, transferring, renewing, removing, consigning, mailing, shipping, trading in and enforcing intangibles.

(c) Receiving the income, increase, issues and profits of intangibles.

(d) Having and possessing the right to transmit the same by will and of making gifts thereof and therefrom and of having the right to allow such property to pass to other persons by descent under the intestate laws of the State of Indiana.

(e) For the right to have such intangibles separately classified for taxes levied, assessed and collected on account thereof and/or measured thereby."

It is clearly seen that sub-divisions (b), (c), (d) and (e) apply to the owner or holders of intangibles. Part 2 of said section provides:

"Such tax at the rate provided in this act shall be measured by intangibles, wherever located:

(a) Owned by any taxpayer except his intangibles having an actual business situs outside the State of Indiana.

(b) Controlled by any person and/or fiduciary and having a business situs in this state and in the possession of or under the control and/or management of any such person and/or fiduciary."

It is clearly seen that last sub-division (a) applies to the owner of intangibles and (b), by any person or fiduciary who has in his possession or control, intangibles. Sec. 3 provides that the rate of tax shall be five cents on each $20 or fractional part thereof of the actual value of every current intangible and five cents per annum or fractional part thereof over one year on each $20 of the actual value or fractional part thereof of each annual intangible. This section refers to the value of the intangible as held by the owner or by any person or fiduciary who controls the intangible. In Sec. 4 of said act, it is provided: ". . . any intangible not having a face value shall have an actual value in the amount determined by the assessor or commission and the owner thereof shall cause said amount to be determined." Here again the act speaks of the owner of the intangible. In Sec. 5 of the act, it is provided: "Before the time the tax for any period is due under the terms of this act, and before the payment of such tax, the owner of any intangible who shall desire or who shall be required by the terms of this act to have the actual value thereof determined or redetermined for the purpose of computing and/or measuring the tax imposed in respect thereof, may apply to the

commission or to the county assessor of the county in this state where such owner resides or is domiciled for such valuation." Here again we find the act speaking of the owner of an intangible and throughout Sec. 6 of said act, it is dealing expressly with the owner of the intangible. And again in Sec. 14 the language is limited to those persons owning or having custody and control of an intangible.

Sec. 17 also refers to the owner or one who has control of the intangibles. Part of the language of this section is: "The county assessor of each county annually shall examine the several records in the office of the recorder and clerk of the circuit court of his county, and ascertain that all persons have paid the tax imposed by the act." This can only mean that the county assessor is to examine the records for the purpose of ascertaining the owners of intangibles and not the issuers of them. It is also said in said section that: "Such assessor may cause any person or fiduciary to appear before him at any time and be sworn to give evidence concerning any intangible owned or controlled by and person and/or fiduciary . . . ." The language limits the giving of evidence as to the owner and not to the issuer of intangibles. Section 31 provides that: "The tax hereby imposed shall be in lieu of all other taxes except estate and/or inheritance and gross income taxes which might have been or might be imposed upon intangibles or against the owners or holders thereof by virtue of the provisions of any law of this state enacted prior to the passage of this act." This provision certainly shows that the intent of the legislature was to impose the tax on the owner of the intangibles. In fact all the provisions of the act refer to the collection of the tax from the owner or holder of intangibles.

Again in Sec. 9 it is seen that the legislature had in mind the owner of the intangible. It is provided in that

section: "On all current intangibles executed after the taking effect of this act, the required stamps, as provided by the terms of this act, shall be attached within ten days from the time of the execution of such intangible," which evidently means the delivery of the intangible.

Section 15 provides: "Any tax imposed by this act, if not paid when due, shall be entered on the tax duplicate of any county where such taxpayer resides and/or where any property of the taxpayer is located as tax on omitted property is entered, as provided by the general taxing laws of this state." This section could not apply to any-one other than the owner of the intangible or any person or fiduciary who controls the intangible.

Under sub-section (a) of Sec. 1 of the act, it is said:

"The term 'intangible' and/or 'intangibles' shall apply to, mean, and include promissory notes, stocks in foreign corporations, bonds, debentures, final judgments from their date of finality, certificates and/or other evidence of indebtedness *issued* (our italics) to any person other than certificates of de-posit in any bank or trust company in this state . . . ."

Here, we see in the first section of the act, the legislature, in explaining the meaning of the term "intangible," limits it to one that has been *issued* to some person. This section, as well as all the others referred to, are in direct conflict and opposed to the theory that the intent of the legislature was to impose a tax on the right to exercise the privilege of "signing, executing and issuing intangibles." Such an construction would emasculate the very purpose and object of the act and be in direct conflict with the clear legislative intent.

We are clearly of the opinion that the legislature by the act in question intended to impose the tax upon the owner of the intangibles and not upon the issuers of intangibles. And as said in cases cited herein, when the legislative intent is ascertained it must be given effect. If the object, purpose and intention of

the legislature, in the enactment of the particular statute, can be fairly ascertained and arrived at, then it is the duty of the court to overlook and disregard all apparent inaccuracies and mistakes in the mere verbiage or phraseology of the statute. *Clare* v. *State, supra.*

If any meaning, in harmony with the other provisions of the act, can be attributed to the five words "Signing, executing and issuing intangibles" as contained in subsection (a) of Sec. 2, it would seem to us to be that the owner of the intangibles would be subject to the tax for the privilege to have had the intangibles signed, executed and issued to him.

We think that all of the sections of the act above referred to, excluding sub-division (a) of the first part of said section, clearly show that the intent of the legislature was to place the tax on the owner of the intangibles or the persons who controlled them and whose business situs is within the State of Indiana. How could language be more clear than the following contained in Sec 2 of the act:

> "Such tax at the rate provided in this act shall be measured by intangibles, wherever located: (a) Owned by any taxpayer except his intangibles having an actual business situs outside the State of Indiana. (b) Controlled by any person and/or fiduciary and having a business situs in this state and in the possession of or under the control and/or management of any such person and/or fiduciary."

Certain definitions are contained in Sec. 1 of the act. Person is defined as follows: "The term 'person' shall include a fiduciary and a firm, partnership, company, association, corporation and/or any and every multiple group that may have the capacity to own or hold property or the custody thereof." "Fiduciary" is defined as follows: "The term 'fiduciary' shall mean and include an executor, administrator, guardian, receiver, trustee, agent, attorney-in-fact, and any person, group or asso-

ciation of persons acting in any trust capacity in the control, management and/or operation of any property."

It is contended by appellants that the language of Sec. 36 of the act which fixes a penalty for violation shows an intention to make the privilege of signing, executing and issuing intangibles taxable, and that by the wording of this section, it indicates that the legislature did not intend to limit the tax to the owner of the intangible.

Section 36 is as follows:

"Whoever makes, signs, issues, authenticates or accepts or causes to be made, signed, issued, authenticated or accepted, any instrument, document, or paper of any kind or description whatsoever evidencing any intangible or any assignment or transfer thereof without the tax thereon being paid or stamps affixed in accordance with the provisions of this act, or whoever makes use of any adhesive stamp to denote any tax imposed by this act without cancelling or obliterating such stamp, as in this act provided, is guilty of a misdemeanor and upon conviction shall pay a fine of not less than twenty-five dollars or be imprisoned not less than thirty days, or both, for each such offense."

This section can not apply and be enforceable to one who makes, signs and issues intangibles or causes them to be made, signed and issued, for the reason that the issuer of the intangibles is not subject to the tax, but only the owner. With these words eliminated, the section would read as follows:

"Whoever . . . authenticates . . . any instrument, document, or paper of any kind or description whatsoever, evidencing any intangible or any assignment or transfer thereof without the tax thereon being paid or stamps affixed in accordance with the provisions of this act, or whoever makes use of any adhesive stamp to denote any tax imposed by this act without cancelling or obliterating such stamp, as in this act provided, is guilty of a misdemeanor, and upon conviction shall pay a fine of not less than

twenty-five dollars or be imprisoned not less than thirty days, or both, for each such offense."

Thus interpreted, Sec. 36 is enforceable to the extent indicated.

The case of *Lutz* v. *Arnold, supra,* is cited by appellants to sustain their position here. The question in that case was whether it was an excise or property tax and whether the act was constitutional. No such questions are presented in the instant case and therefore the case is not controlling.

Since we hold that the appellee is not liable for the payment of any tax on account of the signing, executing and issuing of its bonds, nor on account of the sale and transfer thereof, nor on account of the executing of the supplemental indenture securing said bonds, it is not necessary to pass upon other questions presented.

Judgment affirmed.

Roll, J., dissents.

Fansler, J., concurs in result with opinion.

## CONCURRING OPINION

FANSLER, J. (concurring).—I concur in the result reached by the majority, but cannot agree that the act was not intended to apply to persons "signing, executing and issuing intangibles." The language of section 2 is too clear to be open to construction.

In *Lutz, Attorney General, et al.* v. *Arnold et al.* (1935), 208 Ind. 480, 193 N. E. 840, the law was held valid as an excise tax measure, and it must be so considered. In my opinion, section 2 provides for a tax to be paid by every person residing or domiciled in the state, who signs, executes, and issues an intangible, but the amount of the tax to be paid by such person must be measured by intangibles signed, executed, and issued by the person, and owned or controlled, within the state, as

provided in the last clause of section 2. It follows that, since the intangibles signed, executed, and issued in this case were never owned or controlled by any person within the state, there is no tax due by reason of signing, executing, and issuing those intangibles. There is no liability for tax until the intangibles are signed, executed, and issued, and it may be assumed that intangibles are not issued until they are delivered. If when delivered, so that they are owned or controlled by some person other than the issuer, they are not owned or controlled within the state, there is nothing by which to measure the tax, and there is no tax.

The effect of this provision is that persons signing, executing, and issuing intangibles to owners or holders within the state are taxed, and those signing, executing, and issuing intangibles to holders outside of the state are not taxed, a discrimination in favor of the latter group. Whether there is a reasonable basis for this discrimination may well be doubted. The question is not here presented, but, unless there is a reasonable basis for discrimination, the Constitution would forbid the tax upon the one group while the other is exempt.