MERIDIAN MORTGAGE COMPANY, INC., Appellant (Plaintiff Below),

v.

STATE of Indiana, Indiana Department of State Revenue, Intangibles Tax Division and Theodore Sendak, as Attorney General of Indiana, Appellee (Defendant Below).

No. 2–378A85.

Court of Appeals of Indiana, Second District.

Oct. 9, 1979.

Rehearing Denied Jan. 14, 1980.

Arthur H. Northrop, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Victoria R. Van Duren, Deputy Atty. Gen., Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Plaintiff-appellant Meridian Mortgage Company, Inc. (Meridian) is appealing from a declaratory judgment which held that Meridian was the owner of certain mortgages and not entitled to a refund for Indiana intangibles taxes paid in 1971, 1972, and 1973 on such intangibles.

We affirm in part and reverse in part.

## FACTS

The facts are not in dispute:

Meridian is a mortgage broker with its principal place of business in Marion County, Indiana. Its business consists of finding home buyers in need of financing and securing temporary and permanent mortgage loans and servicing the mortgage loans after mortgages are placed. It never advances funds of its own for mortgage purposes and is not in the business of lending money.

Since 1959 Meridian has participated in various agreements with American Fletcher National Bank (the Bank) and various title companies (primarily Commonwealth Title, Chicago Title, Lawyers Title, and Pioneer Title).[1] These agreements are all essential-

---

1. The following are excerpts of pertinent provisions from the Agreement of May 6, 1965 between Meridian, the Bank, and Chicago Title Insurance Co. The parties have stipulated that this Agreement is virtually identical to the other Agreements and illustrates the transactions among the parties:

    1. This Agreement in no way obligates Chicago to accept any mortgage loan for disbursement and in no way obligates Bank to make any loan to Meridian, but merely sets forth the terms, conditions and procedures which apply to loans hereafter made by Bank to Meridian and secured by the pledge of mortgage loans hereafter accepted for disbursement by Chicago.

    2. Whenever Meridian shall desire to borrow money under the terms of this Agreement, it shall, by way of letter of application and transmittal, deliver to Bank the following:

    a) Its executed collateral agreement and note in form approved by Bank and payable to the order of Bank, due not more than one hundred eighty (180) days from date, which note shall be in the principal amount of such sum, and bearing interest at such rate, as shall be agreed upon from time to time by Bank and Meridian.

    b) A copy of the mortgage note which Chicago will subsequently cause to be executed by the mortgagors prior to the disbursement of the mortgage loan pledged as collateral security and showing on the reverse side thereof the endorsement in blank or to order of Bank to be executed by Meridian on the original mortgage note at or before the time of closing.

    c) A copy of the mortgage instrument which Chicago will subsequently cause to be executed by the mortgagors prior to disbursement.

    d) An executed assignment by Meridian in favor of Bank of the mortgage to be given as security for the mortgage note referred to in b) above.

    e) A copy of the commitment letter or agreement issued by an investor satisfactory and acceptable to Bank to purchase such mortgage loan offered as collateral security, which letter or agreement shall indicate the purchase price such investor will pay for the particular mortgage loan being offered as collateral, (unless waived and not required by Bank).

    f) A check of Meridian in an amount equal to the difference between the proposed mortgage loan and the amount of the note of Meridian referred to in a) above for deposit in the Escrow Account referred to in paragraph 5.

    4. Upon receipt of such letter of application and transmittal, together with all such documents required to be furnished in subparagraphs a) through f) of Paragraph 2 above, Bank may elect to make the requested loan to Meridian.

    5. If Bank elects to make such loan, it shall credit the loan amount to an escrow account of Chicago and shall also deposit to such account the check of Meridian referred to in sub-paragraph f) of Paragraph 2 above, which funds thus delivered shall be held in trust by Chicago for Bank and shall be withdrawn by Chicago solely for the purpose of providing funds for the disbursement of said mortgage loan processed under the terms of this Agreement.

    9. At the time of closing of said mortgage loans, Chicago shall have the original mortgage note and mortgage executed by the

ly the same and provide for Meridian to seek out individuals interested in financing their homes usually either through VA or FHA loans. The Bank provides temporary financing by advancing the money needed for closing to the title company in exchange for a pledge of the mortgage as security. The title company prepares the documents and holds the notes and mortgage for the Bank. Title to the mortgage is initially negotiated and remains in the name of Meridian until the mortgage is sold by the Bank to a permanent investor.[2]

However, the execution of the mortgage by the borrower to Meridian occurs simultaneously with Meridian's assignment[3] of the mortgage to the Bank. Both transactions take place at the time of closing. This assignment is pursuant to the three party agreement which obligates Meridian to assign the mortgage at this time; the Bank

transfers directly to the title company's escrow account the money for the mortgagor upon Meridian's assignment of the mortgage. Meridian, therefore, never has any control or right to control the mortgage, the proceeds of the loan, nor any discretion in the performance of the transactions which are controlled exclusively by the Bank and the title company.

The verbiage of these "loan" agreements does not accurately describe the actual transaction which occurs. They recite that the Bank "loans" the money to Meridian, but Meridian never receives any such loan. Meridian, in fact, is not even a conduit; the money goes directly from the Bank to the title company for disbursement to the Seller.

The evidence indicates that Meridian lends its credit to the Bank to assist the mortgage borrower to secure a temporary

mortgagors and shall promptly have the mortgage instrument recorded. Chicago shall promptly forward to Bank its bailee letter stating that Chicago holds for the account of Bank the following:

    a) The original executed mortgage note endorsed in blank or to the order of Bank by Meridian;

    b) The original executed and recorded mortgage instrument;

    c) The original FHA commitment for insurance if the mortgage loan is an FHA loan, or the original VA certificate of commitment, if the mortgage loan is guaranteed by the Veterans Administration;

    .    .    .    .    .

Upon request of Bank, Chicago shall deliver such instruments to Bank together with any other documents in connection with such mortgage loans deemed necessary by Bank as the absolute assignee thereof.

    11. When mortgage loans are transferred to commitment purchasers thereof, Chicago shall instruct such commitment purchasers to remit payment for such mortgage loans directly to Bank. Meridian and Bank shall cooperate with Chicago in making such transfers and shall execute any necessary papers to assign or endorse, without recourse, their interest in said mortgage loans to said purchasers thereof. Bank shall account to Meridian for all of the funds thus paid to Bank by such purchaser by applying the proceeds thereof to the particular note secured by the mortgage loan transferred and paid for and remitting the balance, if any, to

the account of Meridian. In the event such purchase funds received by Bank are not sufficient to reimburse Bank as above provided, then Bank shall call for payment of the balance due and owing on the particular note and Meridian shall pay such balance immediately.

    12. Meridian, as agent for Bank, but without charge, shall collect installment payments on each mortgage loan during the time the same is pledged to Bank hereunder and shall, upon request, account to Bank for the same. Bank shall do nothing to interfere with the right of Meridian to service all mortgage loans after they have been processed hereunder and transferred to the commitment purchaser.

2. Unfortunately the record is not specific enough for us to ascertain in exact detail the various documents in the paperflow between the parties.

3. Although the "loan" agreement states that Meridian "assigns" its interest in the mortgage to the Bank, the use of the word "assign" and "assignment" is misleading. The agreement *requires* Meridian to assign the mortgage to the Bank, the assignment is not done freely because Meridian never has control of the mortgage. The mortgage is assigned to the Bank at the same time it is executed to Meridian. Meridian does not own or control the mortgage, because as soon as Meridian acquires interest in the mortgage it is obligated to transfer that interest to the Bank.

loan. Even though Meridian transfers to the Bank its note as well as the note of the mortgagor, there is only one loan and that loan goes to the mortgagor, not Meridian. Meridian's note is relied upon only if the mortgagor defaults on the mortgage. Thus, the Bank would appear to have two parties to look to upon default.

During 1973 this method of individual assignment of mortgages by Meridian to the Bank was substituted by an agreement providing for blanket assignment. This change in agreement was merely for convenience, to eliminate paper work; it did not change the interests or positions of the parties.

Once the mortgage is created, Meridian services the mortgage as an agent for the Bank. The money Meridian collects on the mortgage while owned temporarily by the Bank, is turned over to the title company to be held in their escrow account until the mortgage is sold to a permanent investor. When the mortgage is sold these funds are removed from the escrow account and used in settlement.

Meridian concludes the transaction by locating a permanent investor. The mortgage and not are sold to the permanent investor who sends the funds for purchase directly to the Bank. The title company sends the note and mortgage directly to the permanent investor. Usually Meridian continues as servicing agent for collection for the permanent investor.

Throughout these transactions Meridian never exercises possession or dominion over the mortgages or the mortgage agreement. The notes and mortgages are executed at the title companies which have continuous possession of them until they are sold directly to the permanent investors. Until the mortgage is sold to the permanent investor the power to control the mortgage is with the Bank. The Bank receives the income from the mortgage, receives the proceeds from the sale and has the right to approve the sale to the permanent investor.

Meridian receives a commission for its part in these mortgage transactions. It is paid at one (1%) percent commission on each mortgage and a one (1%) percent commission at closing. If Meridian continues to service the loans for the permanent investor it receives a fee for collecting monthly payments.

Meridian has paid an intangible tax on these mortgages from 1959 (the time these agreements were first entered into) until 1974, when Meridian protested and refused payment for the intangible tax assessed for 1973 on these mortgages.[4]

In December of 1974 a hearing was held and the Department found that Meridian was liable for the intangible tax.

On July 21, 1975, Meridian filed with the Revenue Department a claim for refund for the intangible taxes paid for 1971, 1972 and 1973. Upon the denial of its claim, Meridian unsuccessfully filed a complaint for declaratory judgment with the Marion Superior Court on August 28, 1975.

## ISSUES

We deem the issues [5] to be:

1. Does the statute of limitations bar Meridian's claim for the intangible taxes paid in 1971?

2. Is it necessary for Meridian to own or control the mortgages to be taxed thereon?

3. Does Meridian own or control the mortgages?

---

4. The trial court made the following finding of fact "Plaintiff's voluntary payment of the intangibles [sic] taxes for fourteen years following the first of the series of such loan agreements establishes their awareness of their ownership of the mortgage loan." The payment of taxes alone does not establish ownership inasmuch as the evidence of ownership is to the contrary.

5. Meridian also raises the issue of the unconstitutionality of the intangible tax, but because we reverse on other grounds we need not consider this issue.

## ISSUE ONE

Does the statute of limitations bar Meridian's claim for intangible taxes paid in 1971?

*PARTIES' CONTENTIONS*—While neither party addresses this issue, the trial court did state a conclusion of law that Meridian's claim for refund for 1971 is barred by the statute of limitations.

## DECISION

*CONCLUSION*—Meridian's claim for refund for intangible taxes paid in 1971 is barred by the three year statute of limitations.

The statute of limitations for refund of intangible tax paid is found in *Ind.Code* 6–5–1–7 and provides as follows:

Any person aggrieved by any order, judgment or determination of the commission, after paying the tax, may, within three (3) years from the end of the calendar year in which said tax was paid, file with said commission a claim for refund of said tax. Said commission shall duly consider said claim and determine whether or not said claim shall be allowed or disallowed.

Meridian paid its intangible taxes quarterly and the payment of taxes for the years we are considering were made as follows:

| | |
|---|---|
| April 19, 1971 | $    793.89 |
| June 13, 1971 | 2,406.03 |
| October 14, 1971 | 2,932.95 |
| January 19, 1972 | 2,817.41 |
| April 14, 1972 | 2,984.15 |
| July 21, 1972 | 3,235.02 |
| October 17, 1972 | 3,656.68 |
| January 22, 1973 | 3,518.12 |
| February 25, 1974 | 18,830.70 |
| Interest | 1,713.75 |
| Penalties | 1,883.07 |
| TOTAL | $44,771.77 |

■  As indicated, three payments of the 1971 intangible tax were made in 1971. Ac-cording to the statute a claim for refund should have been made within three (3) years of the end of 1971, that is by the end of 1974. The record shows that the claim for refund was filed with the Commission on July 21, 1975. Thus Meridian's filing was not timely.

Meridian does argue in its Motion to Correct Errors that the hearings which were held in December of 1974 concerning Meridian's liability for intangible taxes tolled the statute of limitations. This argument is meritless, the hearings held in December of 1974 were merely a consideration of Meridian's protest. It was not until 1975 that the actual claim for refund was filed. This filing was timely for claims for taxes paid in 1972 and 1973.

We therefore affirm the decision of the trial court in denying Meridian a refund for intangible taxes paid on mortgages in the year 1971.

## ISSUE TWO

Is it necessary for Meridian to own or control the mortgages to be taxed thereon?

*PARTIES' CONTENTIONS*—The parties do not argue this issue as such. They seem to assume that ownership is necessary for taxation under the Intangible Tax Statute.

However, from even a careful reading of the statute it is not immediately clear whether actual ownership or control is necessary. And such a determination is essential to draw a conclusion as to Meridian's liability for the tax.

## DECISION

■  *CONCLUSION*—In order to be taxed under the Intangible Tax Statute, it is necessary for the taxpayer to either own or control the intangible (mortgage).

Our concern is with one statute, *Ind.Code* 6–5–1–2:[6]

On and after the passage of this act, every person residing in and/or domiciled in this state, shall pay a tax to the state of Indiana at the rate and in the manner provided in this act, for the right to exercise any one (1) or more of the following privileges:

(a) Signing, executing and issuing intangibles;

(b) Selling, *assigning*, transferring, renewing, removing, consigning, mailing, shipping, trading in and enforcing intangibles.

(c) Receiving the income, increase, issues and profits of intangibles.

(d) Having and possessing the right to transmit the same by will and of making gifts thereof and therefrom and of having the right to allow such property to pass to other persons by descent under the intestate laws of the state of Indiana.

(e) For the right to have such intangibles separately classified for taxes levied, assessed and collected on account thereof and/or measured thereby.

Such tax at the rate provided in this act shall be measured by intangibles, wherever located:

(a) *Owned by* and taxpayer except his intangibles having an actual business situs outside the state of Indiana.

(b) *Controlled by* any person and/or fiduciary and having a business situs in this state and in the possession of or under the control and/or management of any such person and/or fiduciary. (emphasis added)

In construing this statute should both of these paragraphs with their respective sub-paragraphs be read together so that in addition to "issuing", "selling", "assigning", etc. the taxpayer must also own or control the intangible in order to be subject to tax? That part of our inquiry has been unequivocably answered by our Supreme Court when it construed this very same statute in *Zoercher v. Indiana Associated Telephone Corp.* (1937), 211 Ind. 447, 7 N.E.2d 282:

We are clearly of the opinion that the Legislature by the act in question intended to impose the tax upon the owner of the intangibles and not upon the issuers of intangibles.

. . . . .

We think that all of the sections of the act above referred to, excluding subdivision (a) of the first part of said section, clearly show that the intent of the Legislature was to place the tax on the owner of the intangibles or the persons who controlled them and whose business situs is within the State of Indiana.[7]

211 Ind. at 459–60, 7 N.E.2d at 287.

The Supreme Court's construction of this statute was soundly premised on the funda-

---

**6.** The 1977 Acts P.L. 84, § 2 repealed *Ind.Code* 6–5–1–2. The corresponding section, *Ind.Code* 6–5.1–2–1 provides:

(a) A person residing or domiciled in Indiana shall pay an intangibles tax in the manner provided in this article for exercising any of the following privileges:
(1) Executing, selling, assigning, transferring, renewing, removing, consigning, mailing, shipping, trading-in, controlling, or enforcing an intangible;
(2) Receiving income, increase, issues, or profits of an intangible;
(3) Passing an intangible or income from an intangible to another person by will, gift, or intestate succession; or
(4) Having an intangible classified for tax purposes.
(b) In the case of a trust existing under a trust instrument which empowers the settlor

to amend or revoke the trust, for purposes of determining situs and tax liability under this article, the settlor, rather than the fiduciary, is the owner of the intangibles in the trust. In all other cases involving a fiduciary, the fiduciary is the owner.

Our opinion here is limited to an application of the pre-1977 law to the facts before us. We express no opinion as to the application of the new law.

**7.** *Zoercher* also made the following relevant observations:

At the time the act was passed, and since then, it has generally been conceded that the tax was to be paid by the owner of the intangibles. This was the opinion of the State Board of Tax Commissioners of Indiana. In a pamphlet prepared by said board on the intangible tax act, with questions, an-

mental principle that a statute must be construed as a whole, each part or provision must be considered with every other part or provision and, if possible, every word must be given meaning and effect. *Indiana State Highway Commission v. White* (1973), 259 Ind. 690, 291 N.E.2d 550; *Marhoefer Packing Co. v. Indiana Department of State Revenue* (1973), 157 Ind.App. 505, 301 N.E.2d 209. 2A Sutherland, Statutes and Statutory Construction, §§ 46.05, 46.06 (4th ed. C. Sands ed. 1973). And in concluding that ownership of the intangible was necessary to trigger intangible tax, the precedent was set to decide this case.

■ Following *Zoercher*, then, it does not suffice that Meridian trade in intangibles, it must also either own or control them. So we turn to that issue.

### ISSUE THREE

Does Meridian own or control the mortgages?

*PARTIES' CONTENTIONS*—Meridian contends that at no time did it actually own or control the mortgages. Meridian sees its function as that of a broker who oversees the transaction and acts as an agent for the Bank.

The Revenue Department responds that Meridian did in fact own the mortgage. Title to the mortgages was in Meridian's name and Meridian retained ownership of the mortgage because it merely pledged the mortgage to the Bank as security for the loan.

### DECISION

*CONCLUSION*—Under the undisputed circumstances of this case, Meridian neither owned nor controlled the mortgage and therefore is entitled to a refund for intangible taxes paid thereon in the years 1972 and 1973.

Considering the evidence most favorable to the trial court's judgment, did Meridian either own or control the mortgages? At the outset we know that control is an indicium of ownership, and so we shall deal with these two concepts together. *Department of Financial Institutions v. Holt* (1952), 231 Ind. 293, 108 N.E.2d 629; 73 C.J.S. *Property,* § 13 (1951).

Ownership of property is subject to varying definitions and includes many different interests and rights. *See* 73 C.J.S. *Property, supra* at § 13.

■ Although the word owner as used in the statute is not defined, we are bound to interpret in according to its plain and ordinary meaning. *Park 100 Development Co. v. Indiana Department of State Revenue* (1979), Ind.App., 388 N.E.2d 293; *Potter v. Cline* (1974), 161 Ind.App. 349, 316 N.E.2d 422; 2A Sutherland, *supra* at § 46.01.

■ The three primary indicia of ownership of personal property are *title; possession;* and *control,* which includes the right to sell, dispose of, or transfer. *See* Restatement of Property, § 10 *Owner,* Comment b (1936), Smith & Boyer, Survey of the Law of Property 456 (2d Ed. 1971). *See generally* Black's Law Dictionary 996–97 (5th Ed. 1973).[8]

■ Considering *title.* Until the mortgages were assigned to the permanent in-

swers, forms, rules, and regulations, the board, on page 8 under section 2 of the act, stated, "the tax is paid by the holder of the intangible." And the Attorney General of the State of Indiana gave as his opinion that it was the owner of the intangible who was subject to the tax. Opinions of Attorney General 1934, p. 422. While, of course, the opinions of the State Tax Board and the Attorney General are not controlling, the practical construction of a statute is influential. *State ex rel. v. Billheimer*, 178 Ind. 83, 96 N.E. 801. In the case of *State ex rel. Michener v. Harrison et al.,* 116 Ind. 300, 19 N.E.

146, 149, it is said: "And so the practical construction given to a statute by the public officers of the state, and acted upon by those interested, and by the people, is to be considered in cases of doubt."

8. Our Supreme Court has also said that property is more than a physical object, it includes the right to acquire, possess, use and dispose of without control or diminution. *Department of Financial Institutions v. Hole, supra; Department of Insurance v. Motors Insurance Corporation* (1956), 236 Ind. 1, 138 N.E.2d 157.

vestor, Meridian did ostensibly have title to them; Meridian's name appeared on the mortgage form as the mortgagee. This fact alone, however, is not necessarily fatal to Meridian's claim that it was only a broker.

There is a considerable body of law to the effect that holding title alone does not necessarily confer ownership. The law of trust provides one analogy. The trustee has legal title to the property, but it is the beneficiary who is the equitable owner and who is entitled to the benefit and enjoyment of the property. *Colbo v. Buyer* (1956), 235 Ind. 518, 134 N.E.2d 45; *Bailey v. Bailey* (1967), 142 Ind.App. 119, 232 N.E.2d 372; *Snouffer v. Peoples Trust & Savings Co.* (1965), 140 Ind.App. 491, 212 N.E.2d 165; Bogert & Bogert, The Law of Trusts and Trustees § 12 (2d Ed. 1965).

Even more analagous is the stockbroker who holds stock for his customer in his own name or in street name. Here again legal title does not indicate the true owner of the property. *See e. g., Stevens v. Abbott, Proctor & Paine* (E.D.Va.1968), 288 F.Supp. 836; *Barthelmess v. Cavalier* (1934), 2 Cal. App.2d 477, 38 P.2d 484 (the street name is the name of a person other than the owner which is inserted for the convenience of rapid trading); *R. Baruch & Co. v. Springer* (D.C.1962), 184 A.2d 206. It is merely a matter of convenience for the parties in aid of transferring stocks or bonds which are often held for short periods of time. The stockbroker is not the true owner and has none of the incidents of ownership.

And so it is with Meridian. Its name appears as the legal title holder until a permanent investor is found, but it is not entitled to exercise any of the incidents of ownership (possess, manage, assign, hypothecate, transfer, or sell). However, this arrangement is not for the convenience of the parties, but appears to be a mechanism by the Bank to secure Meridian's credit in support of the mortgagor (notes and mortgages are executed by both the borrower and Meridian).

Which brings us to *possession.* Meridian never has possession of the mortgages. All transactions were closed at the offices of the title company which at all times kept possession of all instruments until the mortgages were sold to permanent investors.

As to *control.* Meridian had no discretion as to how the mortgages would be handled. The mortgages were unconditionally assigned to the Bank and the Bank had the right to the monthly income payments and ultimately the right to approve of and receive the proceeds from the sale of the mortgages.[9] In considering the control and interest which a broker has over the property with which he deals *Haas v. Ruston* (1895), 14 Ind.App. 8, 42 N.E. 298 is pertinent:

> A broker is a peculiar kind of an agent, and brokerage is a peculiar kind of agency. It is the business of a broker to negotiate contracts between others in matters of trade and commerce. He usually deals with the contracting parties and not with the things which may be the subject of the contract. *He has neither interest in nor possession of the property* which it is his business to buy or sell for others, and ordinarily he has no implied power to buy or sell in his own name. It is in these respects that a broker differs from a factor and from an ordinary agent. (emphasis added)

*See also Indiana Department of State Revenue v. Boswell Oil Company* (1971), 148 Ind.App. 569, 268 N.E.2d 303.

Thus, Meridian can be classed as a broker. It has neither an interest in nor possession of the property.

Our conclusion that Meridian is not an owner of these mortgages, but is merely a broker, is not altered by the fact that the agreement between the Bank, the title companies and Meridian treats Meridian as a borrower. Ownership can not be conferred by a wave of a magic semantic wand. We will look past the terms of the agreement to the actual transaction involved. *Thompson*

---

**9.** In addition, a letter was admitted into evidence from the legal department of the Bank which stated that the Bank believed it was the owner of the mortgages.

*v. Arnold* (1958), 238 Ind. 177, 147 N.E.2d 903; *Madding v. Indiana Department of State Revenue* (1971), 149 Ind.App. 74, 270 N.E.2d 771.

Even though the agreement treats Meridian as the recipient of a loan in exchange for its note to the Bank, the Bank maintained absolute control of all instruments so that it could hold Meridian liable as a "borrower" and protect its own interests exclusively.[10] *Thompson, supra; Madding, supra.*

It would be folly for us to hold that form triumphs over substance under these conditions. To fit these transactions into "ownership" or "control" on the part of Meridian would seem very much like trying to make a crab into a lobster without altering its shell.

Meridian was not subject to Indiana Intangible tax paid in the years 1972 and 1973, and therefore is entitled to refunds for taxes paid in those years.

Affirmed in part and reversed in part.

SHIELDS and SULLIVAN, JJ., concur.

---

10. The basis of Meridian's liability to the Bank is not before us, but the obvious intent of the entire scheme is to make Meridian liable and at the same time fully protect the Bank by maintaining control of all instruments throughout.