In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2258

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSHUA N. BOWSER, et al.,

*Defendants.*

APPEAL OF: BRADLEY W. CARLSON

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cr-00102-TWP-DML — **Tanya Walton Pratt**, *Judge.*

ARGUED JANUARY 19, 2016 — DECIDED AUGUST 23, 2016

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge*. This appeal involves the government's efforts to seize personal property bearing the insignia of the Outlaws Motorcycle Club (the "Outlaws"), and the effort of a representative of the Outlaws to intervene to prevent those forfeitures. The forfeiture actions stemmed from criminal cases brought against a number of Outlaws members, including all members of the Indianapolis chapter of the Outlaws. As we summarized in *United States v. Knoll*, 785 F.3d 1151, 1152–53 (7th Cir. 2015), "[t]his case began with a forty-nine count

indictment that charged fifty-one individuals (all members of the Outlaws) with racketeering, mail and wire fraud, money laundering, drug trafficking, extortion, running an illegal gambling business, witness tampering and firearms offenses, among other things." Included in that indictment, was a count charging nineteen members of the Outlaws with violations of the Racketeer Influenced and Corrupt Organizations statute (RICO), based on allegations that the Outlaws was an enterprise and its members participated in that enterprise through the commission of various crimes. The indictment included a notice of the government's intent to forfeit any and all property affording the RICO defendants with a source of influence over the enterprise and all property obtained, directly or indirectly, from racketeering activity.

On July 11, 2012, in connection with the arrests of the Outlaws members, the FBI executed search warrants on the Outlaws' clubhouses in Indianapolis and Fort Wayne, Indiana, the Outlaws' bunkhouse in Indianapolis, and several individual residences. Pursuant to those searches, the FBI seized numerous items bearing the insignia of the Outlaws, and the FBI sought forfeiture of those items. That property included, but was not limited to: vests, patches, shirts, hats, belt buckles, signs, mirrors, flags, calendars, books, and pictures. The Outlaws used the symbols on the clothing to conspicuously display their presence and to deter other groups from infringing on their territory. The items included the symbol of the Outlaws which was a skull and crossed pistons, and patches with slogans such as "God Forgives, Outlaws Don't" and "Snitches Are a Dying Breed" which communicated a threat to those who would seek to oppose the Outlaws.

One defendant, Christian Miller, was found guilty after trial, but the remaining eighteen defendants pled guilty—sixteen defendants to all charges and two defendants to all but the RICO counts to which they pled nolo contendere. As part of the plea agreements, each agreed to forfeit the Outlaws paraphernalia seized by the FBI. After the government sought and obtained final orders of forfeiture from all but one defendant, and was in the process of finalizing forfeiture with the remaining Outlaws defendant, the court received a letter from Bradley W. Carlson which it interpreted as a motion to intervene in the criminal forfeiture actions. Pursuant to 18 U.S.C. § 1963(l)(2), "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States … may … petition the court for a hearing to adjudicate the validity of his alleged interest in the property." In order to pursue such relief, a petitioner's right to the property must have vested in petitioner rather than the defendant or be superior to any right, title or interest of the defendant at the time of the commission of the criminal acts, or the petitioner must be a bona fide purchaser of the property. 18 U.S.C. § 1963(l)(6). The government sought to dismiss the motion as untimely in that final forfeiture orders had already issued, but Carlson responded by filing a motion to reopen the final orders and also challenging orders seeking forfeiture of indicia and memorabilia of the Outlaws.

In seeking to reopen the forfeiture actions under Federal Rule of Civil Procedure 60(b), Carlson contended that he had a property interest in all of the Outlaws paraphernalia and that the government had failed to provide him with direct notice of the forfeiture actions. Therefore, the issue before the district

court was whether Carlson was due direct notice of the forfeiture actions filed in this case. The notice requirements for such forfeitures is set forth in 18 U.S.C. § 1963(l)(1), which provides that

> [f]ollowing the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

In addition, Federal Rule of Criminal Procedure 32.2(b)(6)(A) requires the government to "publish notice of the order and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding." The government provided notice of all of the forfeitures to each of the defendants, and also posted notice of each forfeiture on the official government forfeiture site at www.forfeiture.gov for 30 consecutive days.

Carlson asserts that he was entitled to direct written notice of the order because he claims that he has been elected by the collective membership of the Outlaws to protect, manage, direct, oversee, and control all indicia and memorabilia of the Outlaws in the United States. Carlson maintains that all patches and registered collective marks of the Outlaws are

owned solely by the collective membership of the Outlaws, not by any individual members. As support for his position, Carlson points out that Outlaws members believe that the property bearing the markings of the Outlaws are the property of the Outlaws as a whole, and that Outlaws members must return their "colors" (paraphernalia with Outlaws markings) if they cease to become active members. The government concedes that Outlaws members share that belief. Carlson claims that by virtue of his elected position he has been vested by the membership of the Outlaws with a "superior possessory interest in all items of [Outlaws] indicia."

The district court denied that motion, as well as Carlson's subsequent motion to alter or amend the judgment pursuant to Rule 59(e). The district court determined that Carlson had failed to demonstrate that the government was aware of Carlson or his alleged interest in the property, and that in any event Carlson had failed to demonstrate a property interest in the Outlaws paraphernalia. We review the district court's Rule 60(b) determination for abuse of discretion. *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 652 (7th Cir. 2014); *United States v. 8136 S. Dobson St., Chicago, Ill.*, 125 F.3d 1076, 1082 (7th Cir. 1997).

On appeal, Carlson presents two issues for our resolution: whether Carlson possessed an interest in the property sufficient to entitle him to notice of the forfeiture proceedings, and whether the notice provided by the government was adequate as both a statutory and constitutional matter. Because Carlson fails to adequately allege that he had a lawful property interest at stake of which the government reasonably would have been aware, we need not consider his second contention that the

notice supplied to all members of the Indianapolis Outlaws chapter, including its president, was inadequate to inform the Outlaws' collective membership. [1]

As Carlson concedes, a lawful property interest for purposes of the forfeiture notice provision is created and defined by state law. *Knoll*, 785 F.3d at 1156; *United States v. 5 S 351 Tuthill Rd., Naperville, Ill.*, 233 F.3d 1017, 1021 (7th Cir. 2000), amended on denial of reh'g (Mar. 21, 2001). Therefore, we must look to Indiana law to determine whether Carlson has alleged a property interest recognized in that state. Only a person possessing a legal interest, rather than an equitable interest, in property will have standing to challenge its forfeiture. *Knoll*, 785 F.3d at 1156; *United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007). Carlson alleges only that the property subject to forfeiture was not owned by individuals, but was owned by the "collective membership" of the Outlaws and he was an agent of that collective membership for the purposes of maintaining and controlling the property and therefore had a

---

[1] Although both parties rely on trial testimony in arguing as to ownership, Carlson asserts that the government should not be able to point to testimony in the criminal case that Carlson never had an opportunity to contest. Setting aside the contradiction in relying on such testimony when useful and disavowing its relevance when not, the argument is problematic on a more fundamental basis. The issue here is whether the government should have know that Carlson had an ownership interest in the property such as to entitle him to direct notice. The government's knowledge of the Outlaws gleaned in the trial testimony is relevant to that determination regardless of whether that information could have been contested by Carlson.

lawful, possessory interest over the forfeited items by virtue of that agency relationship.

Under Indiana law, ownership of personal property is determined by reference to the indicia such as title, possession, and control. *Harden v. Monroe Guaranty Ins. Co.*, 626 N.E.2d 814, 820 (Ind. App. Ct. 1993); *Womack v. State*, 738 N.E.2d 320, 324 (Ind. Ct. App. 2000); *National Serv-All Inc. v. Indiana Dept. of State Revenue*, 644 N.E.2d 954, 957 (Ind. Tax Ct. 1994); *Meridian Mortgage Co. v. State*, 182 Ind. App. 328, 339, 395 N.E.2d 433, 439 (1979); *Rhoades v. State*, 70 N.E.2d 27, 29 (Ind. S. Ct. 1946). Carlson has not alleged any of these indicia, and in fact does not cite to any Indiana cases in asserting the property interest. Although he has alleged an understanding that property cannot be transferred to non-members, he does not identify what type of interest, if any, in that property was retained by the Outlaws—whether an option to purchase back, a right of first refusal, a termination of a bailment or lease, etc.—and whether that interest is a legal interest that grants standing or an equitable or other interest that does not. He fails in fact to cite to Indiana law at all to establish the legal interest in the property despite recognizing that property interests are defined by state law. Moreover, among the forfeitures challenged by Carlson are those of three persons who were former members of the Outlaws, yet still in possession of such paraphernalia, and at least one person who was never an Outlaws member, thus contradicting the claim that the collective membership exercised that control over distribution.

In his initial brief to this court, Carlson appeared to assert a bailment relationship, wherein the property would be possessed by the Outlaws members only as bailees with the

Outlaws organization presumably the bailor, but he affirmatively denied any such argument in his reply brief and on appeal. Bailment, at least, is a recognized property interest, although appropriately abandoned given the absence of evidence that this was in fact a bailment relationship. He relies instead only on an argument that his legal interest is as an agent of the Outlaws and that his agency interests are a legally recognized interest. But an agent can possess only the interest of his principal, and Carlson has not alleged what legally protected interest the principal—the Outlaws—has in the property. Carlson did not assert, for instance, that the Outlaws have a property interest because the Outlaws purchased or manufactured the paraphernalia and retained a recognized legal interest in it, nor does he allege that the Outlaws possessed it and distributed it in such a manner that the Outlaws retained a legal as opposed to equitable interest in the property. In fact, at oral argument counsel for Carlson did not know whether the Outlaws organization had purchased the items, and did not know where the items were purchased or where manufactured. He asserted that "ownership is ownership" regardless of whether one has a receipt for the items or whether the items are found on the street. But of course, the origin of the items—such as whether they are borrowed, stolen, purchased, leased, or not possessed at all—is in fact relevant to whether the Outlaws have a legal interest recognized under state law. Carlson maintained that all parties agreed as to ownership, but the existence of a legally enforceable property interest is a matter of state law not a matter to be decided by the parties. Persons joining the Outlaws may well understand that the Outlaws colors must only be worn by Outlaws

members in good standing, and that the members will take away a person's colors if they leave the Outlaws either voluntarily or otherwise. That type of expectation may be found in other contexts such as in street gangs, in which gang members may enforce their gang rules and prohibit non-members from displaying the symbols of the gang; that does not vest those gang members with a legally protected interest in those symbols or vestments.[2] In fact, Outlaws also purport to require members to color over tattoos containing Outlaws symbols if they leave the Outlaws, but that does not suggest ownership of the tattoos. The attempt to control member behavior and the use of symbols is prevalent in many organizations—criminal or otherwise—but does not in itself establish a lawful property interest.

In short, it is not enough to merely assert that the Outlaws members understand that Outlaws insignia can only be possessed and exhibited by Outlaws members, or even to assert their "agreement" that the items are owned by the collective membership not the individuals. "Courts generally do not determine legal interests in property for forfeiture purposes by evaluating the history and traditions of the Outlaws" and the equitable interests created by that history and tradition "are insufficient to establish property rights." *Knoll*, 785 F.3d at 1156. State law defines property interests, not

---

[2]  Although Carlson states that the collective marks of the Outlaws are registered with the United States Patent and Trademark Office, Carlson makes no argument relating to trademark protection in his brief and therefore we do not address that in this opinion.

the agreements by individuals as to who will be deemed an owner.

In *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 642-43 (7th Cir. 2015), we recognized that "an assertion of ownership combined with some evidence of ownership is sufficient to establish standing at the summary judgment stage of a civil forfeiture action." Here, Carlson asks us to hold that in a criminal forfeiture, an assertion of ownership, without more, is sufficient to alert the government that he has a property interest in the items as against those who were in possession of the items and conceded their forfeiture. It is not. Such an approach is inconsistent with the law, and understandably so, as it would be rife for abuse. Persons engaged in a criminal enterprise could simply agree among themselves that all personal and real property in their possession is actually owned by their law-abiding grandmother down the block, and the grandmother could contest the forfeiture of such property without any other allegation of a legal interest in the property.

The district court in *United States v. Rosga*, 864 F. Supp. 2d 439 (E.D. Va. 2012), recognized such a danger in a case presenting the same issues here—an effort to intervene in forfeiture actions based on ownership by the collective membership of the Outlaws. As in this case, the *Rosga* court was presented with forfeiture of Outlaws paraphernalia following RICO convictions of sixteen Outlaws members, and the government provided notice to those defendants as well as the public notice on its website. Four Outlaws members not named as defendants in the criminal case then contested the forfeiture, seeking the return of all indicia and other property associated with the

Outlaws based on the argument that none of the individual defendants owned the Outlaws items. The court held that, in order to adequately allege standing to contest a forfeiture, the claimants must establish "at least 'a facially colorable ownership interest' in the property in question." *Id.* at 448. The *Rosga* court noted that dismissal of the petition on such standing grounds would be proper only if the facts taken as true in the light most favorable to petitioners, "do not plausibly demonstrate a cognizable legal interest in the forfeited assets." *Id* at 449. Faced with the same "collective membership" argument raised here, the court held that the petitioners—who never claimed to have been in possession of the property and asserted only unsupported legal conclusions of collective ownership—failed to demonstrate a cognizable interest in the items. The court noted that criminal forfeiture statutes should be construed to deny relief to parties engaged in manipulating ownership. The court deemed "well-founded" the government's argument that the collective ownership mechanism asserted by the Outlaws was "designed solely 'to insulate from forfeiture property used by convicted members of the organization.'" *Id.* at 450.

The allegations relied upon by Carlson are similar. Carlson relies solely on the understanding of the members set forth in the membership affidavit that each member signs, and attached his American Outlaws Association (AOA) Membership Affidavit to the Rule 60(b) motion. That affidavit contains only a few sentences, all of which reflect a focus on evading law enforcement. First, the affidavit defines ownership of property, declaring that "every member of the AOA is informed and agrees, that a member can only surrender, transfer or forfeit

indicia of the AOA to another member in good standing, therefore all property bearing the markings of the AOA is the property of the AOA as a whole, not the individual." In the sentence following that declaration, the affidavit discusses possible forfeiture, and the member agrees that if the property is seized by law enforcement he will pursue it by all legal resources that are available. Finally, the final sentence in that same affidavit provides "I also know and agree that by becoming a member of the AOA it is not, nor has ever been a criminal enterprise." That statement mirrors the statement concerning the property interest in that it reflects a legal conclusion, with no factual basis whatsoever, which appears to be designed to subvert law enforcement efforts. The statement that it was not a criminal enterprise is belied by the RICO charges and convictions as to all members of the Indianapolis chapter in the underlying criminal action here, and the statement concerning the ownership interest fares no better. The affidavit statements do not provide any basis for the court to identify what legal interest the Outlaws have in the property, and certainly would not put the government on notice that the "collective membership" possessed a legal ownership interest in the property. As the Indiana Court of Appeals recognized, "[o]wnership can not be conferred by a wave of a magic semantic wand. We will look past the terms of the agreement to the actual transaction involved." *Meridian Mortgage*, 395 N.E.2d at 440. Carlson has failed to identify the origin of the items or allege the Outlaws relationship at its inception, and the district court properly held that Carlson was not entitled to individualized notice.

The decision of the district court is AFFIRMED.