MADDING, ET AL. *v.* INDIANA DEPARTMENT OF STATE REVENUE, ET AL.

[No. 1269A226. Filed June 21, 1971.]

*James J. Lewis, Robert V. Kixmiller, Shake, Lewis, Lewis & Kixmiller,* of Vincennes, *Elmer F. Marchino,* of Indianapolis, for appellants.

*Theodore L. Sendak,* Attorney General, *Hugh R. Couch, Larry J. McKinney,* Deputies Attorney General, for appellees.

BUCHANAN, J. — *STATEMENT OF THE CASE AND FACTS*—By this action, Plaintiffs-Appellants seek a refund of Indiana gross income taxes claimed to have been illegally and erroneously levied for the year 1964 in the amount of $57,809.17 on the theory that a nontaxable reorganization was effected rather than gross income received.

Appellants Ellis C. Madding, Elmo R. Madding and Richard H. Schaffer were the sole shareholders, officers and directors of the Appellant eight Indiana corporations.

On December 17, 1964, each of these eight corporations as Seller (the Corporations) and the three stockholders individually (the Individuals) entered into an identical plan and Agreement of Reorganization with Tennessee Corporation (Tennessee), a Delaware corporation and wholly owned subsidiary of Cities Service Company, whereby substantially all the assets of the Corporations were to be transferred to Tennessee in return for Common Stock of Cities Service Company (Common Stock) to be transferred to the Individuals. Pertinent parts of a prototype Plan and Agreement (the Agreement) are as follows:

"PLAN OF REORGANIZATION dated December 17, 1964, between TENNESSEE CORPORATION, a Delaware corporation (hereinafter called 'Tennessee') and LIQUI-LIZER CORPORATION, an Indiana corporation (hereinafter called the 'Seller').

## "WITNESSETH:

"The reorganization will comprise the transfer to Tennessee, or to a wholly-owned subsidiary of Tennessee as designated by Tennessee, of substantially all the assets, properties, business and goodwill of Seller (and the assumption by Tennessee of the Seller's liabilities as hereinafter specified) in exchange solely for shares of Common Stock $10.00 Par Value of Cities Service Company (hereinafter called 'Common Stock'), the parent controlling Tennessee through 100% stock ownership therein, the prompt dissolution of Seller, and the distribution of Common Stock to the stockholders of Seller according to their respective interests, all upon and subject to the terms and conditions of the Agreement hereinafter set forth. In the course of the reorganization the stockholders of Seller will receive Common Stock in exchange for their stock in Seller.

## "AGREEMENT

"Agreement dated December 17, 1964, between TENNESSEE CORPORATION, a Delaware corporation (hereinafter called 'Tennessee'), LIQUILIZER CORPORATION, an Indiana corporation (hereinafter called the 'Seller'), and E. C. MADDING, of 1413 Kimmell Road, Vincennes, Indiana, ELMO R. MADDING, of 2801 Elberta Drive, Vincennes, Indiana, and RICHARD H. SCHAFFER, of 2130 Ridge Road, Vincennes, Indiana (which three last named parties are hereinafter referred to as the 'Individuals').

## "WITNESSETH:

"In order to consummate the foregoing Plan of Reorganization, and in consideration of the mutual benefits to be derived therefrom, and of the mutual agreements hereinafter contained, the parties hereto do hereby agree as follows:

"1.   Seller and the Individuals and each of them jointly and severally represent and agree that:

"(a)   Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Indiana. . . .

"  . . .

"3.   Subject to and in reliance upon the representations and agreements of the Seller, the Individuals and Tennessee, and subject to the terms and conditions herein stated:

"(a)   Seller agrees to convey, assign and transfer to Tennessee, and Tennessee agrees to acquire from the Seller, on the Closing Date, all of the properties and assets of the Seller of every kind and description, and its business as a going concern, together with, but not limited to cash, moneys on deposit, the goodwill of the business carried on by the Seller, including the right to the use of its name, trade names, brand names and trademarks, and all of its customers lists, credit and sales records, and all other interests, including choses in action to which it has any right by ownership, use or otherwise, which the Seller may own or in which it has a conveyable or assignable interest on the Closing Date, in exchange for (1) 4,071 shares of Common Stock and (2) the assumption by Tennessee of any and all debts, contracts and other agreements, leases, licenses and other arrangements and all obligations and liabilities of whatsoever kind or nature of the Seller set forth on the balance sheet referred to in paragraph 1(c) hereof ...

"...

"(c)   The closing of the exchange of Common Stock and the assumption of liabilities for the properties and assets to be conveyed, assigned and transferred hereunder shall be made at the office of Tennessee, ... on December 30, 1964, ... (herein called the Closing Date) by the delivery of (i) certificates in such denominations as the Seller may request for the total number of shares of Common Stock to be delivered pursuant to paragraph 3(a), (ii) a written assumption of Seller's liabilities in the form set forth in Exhibit 1 hereto, and (iii) the guarantee of such assumption provided for in paragraph 7 hereof if deliverable at the closing hereunder, against delivery by Seller of appropriate deeds, assignments, bills of sale and other documents of title. ...

"...

"4.   Tennessee, Seller and the Individuals further agree:

"...

"(g)   Seller represents that it is acquiring the shares of Common Stock only for distribution in liquidation to the Individuals as its stockholders, and agrees that it will use said shares only for such purpose.

"...

"6.   The obligations of Seller to make the above-mentioned conveyances and transfers of properties and assets

to Tennessee is subject to the satisfaction or the waiver thereof by the Seller at or prior to the Closing Date of the following conditions:

" . . .

"(c)   Tennessee shall have furnished Seller with (i) certified copies of resolutions duly adopted by the Board of Directors of Tennessee approving the execution and delivery to Seller of this Agreement, authorizing the acquisition from Seller of all the properties and assets of Seller in exchange for Common Stock and the assumption by Tennessee of Seller's liabilities. . . .

" . . .

"8.   (a)   The Individuals, and each of them, agree as stockholders of Seller, and as individuals, to take all action and to vote all shares of stock of Seller held by them in such manner that this Agreement shall be carried out and consummated in accordance with its terms.

" . . .

"9.   (a)   The Individuals and each of them represent that they are acquiring the shares of Common Stock distributable to them upon the liquidation of Seller for investment and with no present intention of selling any of such shares.

" . . .

"(c)   The Certificates representing the shares of Common Stock to be delivered to the Individuals at or after the Closing. . . ."

Section 3 (a) of the Agreement indicates that each corporation as Seller agrees to transfer all of its assets, tangible and intangible, to Tennessee in exchange for Common Stock of Cities Service Company, parent of Tennessee, and the assumption by Tennessee of all liabilities, debts, obligations, etc. of each corporation. Subsequently, at section 4 (g) each Seller corporation represents that it is acquiring stock only for distribution in liquidation to the Individuals as its stockholders, and section 9 (c) contemplates the same procedure.

Common Stock of Cities Service Company was in fact transferred and delivered to the Individuals in their individual names at the time of closing and prior to dissolution of each Seller corporation and prior to publication of notice

of dissolution. The assets were transferred and liabilities assumed also as contemplated by the Agreement. Tennessee received no shares of stock of the Corporations either from the Corporations or from the Individuals.

The signatories to each Agreement were one of the eight corporations (referred to as "Seller" therein), Tennessee, and the Individuals.

The Individuals, pursuant to the Agreement requiring them to take all action and to vote all shares of stock held by them in accordance with the terms of the Agreement, began proceedings shortly after December 30, 1964 to effect legal dissolution of the Corporations. They were finally dissolved on September 7, 1966.

While the Agreement contemplated that the stock held by the stockholders in each of the Seller Corporations would be exchanged for the specified number of shares of Common Stock of Cities Service Company, this did not occur. The stock owned by the stockholders in each of the Seller Corporations was never assigned or transferred to Tennessee or to Cities Service Company.

There is no evidence in the record which indicates that the assets of the Corporations were ever distributed to the Individuals prior to their transfer to Tennessee. The record is also devoid of any reference or proof of the ultimate economic effect to the parties of the transactions here involved.

In order to dissolve, the Corporations sought certificates of clearance from the Gross Income Tax Division. Gross income tax was then assessed against them and the tax paid. The Corporations petitioned the Indiana Department of State Revenue for a refund, which was denied, and after exhausting all other administrative remedies this action was subsequently filed.

The Appellants assign as error that the decision of the trial court is contrary to law, and further specify error in the

striking and omission of certain testimony during the trial.

*ISSUES*—Two questions emerge for determination in this appeal:

I. Did the Corporations receive the Common Stock actually or constructively as a result of the transfer thereof to the Individuals so as to (a) constitute "receipts" and (b) so as to constitute taxable gross income to the Corporations within the meaning of I.C. 1971 6-2-1-1, § 64-2601(h), (i) and (m) Burns 1970 Cum. Supp.?

II. If the Corporations did receive gross income within the meaning of said statutes, is such income exempt within the scope of Burns 64-2601(m)?

*APPELLANT'S POSITION — QUESTION I.* Appellant's basic position is that the total transaction here involved is a reorganization and not a sale of corporate assets and that the trial court erred in treating the transfer of these corporate assets as a sale rather than a merger or reorganization of existing corporate interests. In effect, by giving up their rights and interests as stockholders, the Individuals contend that they in fact transferred the equivalent of their stock for the Common Stock, even though their stock certificates in the Corporations were never physically assigned and delivered to Tennessee. This being true, there can then be no sale, no gross receipts, and no gross income within the meaning of the applicable sections of the Indiana Gross Income Tax Act (the Act). The transaction must be judged by its substance, rather than its form.

Appellants go on to argue that the Corporations did not "receive" the Common Stock, but rather it was transferred to the Individuals for the direct benefit of someone other than the Corporations. Since no benefit accrued to the Corporations and since the stock given the Individuals was meant for their benefit, the Corporations had no gross receipts and therefore no gross income. Appellants point out that the

transfer in question was not made for the payment of any expense, debts or obligations of the Corporations.

*APPELLANTS' POSITION — QUESTION II.* Appellants' contention as to the second question is that even if the Corporations received gross income from the transfer of the Cities Service stock, such a sale would be exempt because a certificate of stock actually represents a proprietary interest in the assets of a corporation and therefore the exchange of the assets of the Corporations for the Common Stock is an exchange of proprietary interests amounting to an exchange of stock for stock even though the certificates themselves were not transferred to Tennessee.

*APPELLEE'S POSITION — QUESTION I.* Appellee, Indiana Department of State Revenue submits that application of fundamental concepts of corporation law require the transfer of the Common Stock to be treated as gross receipts of the Corporations.

Appellee's argument is that there is an attempt here to bypass the corporate entity by directing that the stock be given to the Individuals as shareholders prior to dissolution of the Corporations and since all the assets at the time of the transfer were owned by the Corporations they must be deemed to have acquired gross receipts in the form of stock in the transferee's parent, such stock being the consideration for the sale of all the assets of the Corporations which were transferred to Tennessee.

*APPELLEE'S POSITION — QUESTION II.* Appellee maintains, and the trial court so ruled, that the gross receipts received by the Corporations were not exempt from taxation under the stock-for-stock exemption of Burns § 64-2601 (m) in that (a) the transfer was an exchange of stock for assets and not an exchange of stock for other stock; (b) that the Individuals who received the Common Stock were

not the owners of the assets transferred to Tennessee; and (c) the Common Stock (in Cities Service Company) received by the Corporations was not the property of Tennessee, but rather the property of Cities Service Company, parent of Tennessee.

## DECISION

*QUESTION I.* It is our opinion that the Corporations (a) had gross receipts and (b) that those receipts constituted gross income to the Corporations.

(a) The portion of the statute which defines "receipts" is Burns § 64-2601(h), *supra,* and reads as follows:

"Except as hereinafter otherwise expressly provided, the term 'receipts,' as applied to a taxpayer, shall mean the gross income in cash, notes, credits and/or *other property which is received by the taxpayer or is received by a third person for his benefit.*" (Emphasis supplied.)

The essence of Appellants' argument concerning receipts is that the Corporations did not "receive" the Common Stock nor did they benefit in any way from the transaction and cannot be held accountable since the Individuals received the stock.

Stripped of the nonessential, the transaction before us consists of a transfer of assets owned by the Corporations in return for the Common Stock being transferred directly to the Individuals who own and control the Corporations and who gave no consideration for the Common Stock. The significant facts are that the Corporations owned the assets, the Corporations are owned and controlled by the Individuals, the Individuals are the transferees of the Common Stock for which they gave no consideration prior to dissolution of the Corporations, and the stock of the Individuals in the Corporations was never assigned nor physically delivered to the transferee of the assets of the Corporations (Tennessee). It is a fair inference that the transaction was cast in a mold shaped in whole or part by the dictates of

the Individuals. Appellants now ask us to hold that the Corporations did not receive the Common Stock simply because it was transferred directly to the Individuals.

This is too fast a horse for us to ride. At the time the assets were transferred to Tennessee and the Common Stock to the Individuals, the Corporations were not dissolved and were not even in the process of dissolution. Controlling stockholders, officers and directors of a corporation cannot airily wave their magic wand and claim a corporation has no receipts when *they cause* that corporation to transfer assets owned by it in return for stock transferred directly to the stockholders, even though these same stockholders may *ultimately* be entitled to the consideration which the corporation received for transferring its assets.

The argument that the Individuals received the Common Stock and not the Corporations, founders on the rock of separate corporate entity. As stockholders, the Individuals had no claim to corporate property because the Corporations existed as independent legal entities, separate and distinct from its shareholders. *Hart, Schaffner & Marx* v. *Campbell*, (1942) 110 Ind. App. 312, 38 N. E. 2d 895. A shareholder is entitled to his aliquot share of the corporate assets *after* the debts and liabilities of the corporation have been satisfied and the assets have been distributed in liquidation. *Rhode Island Hospital Trust Co.* v. *Droughton*, (1926) 270 U. S. 69, 46 S. Ct. 256, 70 L. Ed. 473. On the date of closing, *i.e.*, December 30, 1964, the Individuals as stockholders had no interest or ownership in the corporate assets. To hold otherwise would be to do violence to all well established concepts of separate corporate entity.

Since the assets of the Corporations were transferred, then the consideration due for those assets must be considered as being the property of the Corporations; otherwise, the Individuals as officers and directors have participated in a wrongful act, even though they con-

stitute a majority of the directors or stockholders. See *Farwell* v. *Pyle-National Headlight Co.*, (1919) 289 Ill. 157, 124 N. E. 449.

The Individuals were the recipients of what rightfully belonged to the Corporations and cannot avoid receipt of the stock by the Corporations simply by engineering an agreement whereby they cause the corporate assets to be transferred to a third party and receive transfer of the consideration personally.

The Individuals, as officers and directors of the Corporations, were its agents and were bound by well established rules of corporation law preventing them from using the assets of the corporation for their own gain. *First Merchants Nat. Bk.* v. *Murdock Realty Co.*, (1942) 111 Ind. App. 226, 39 N. E. 2d 507. They held it as agents for and on behalf of the Corporations. *Schemmel* v. *Hill, Rec.*, (1929) 91 Ind. App. 373, 169 N. E. 678.

Further, a breach of the agency relationship by an officer or director will impose a trust upon any proceeds received by the agent, as a consequence of his breach, to be held for the benefit of the corporation. *In re M. & J. Tracy, Inc.*, (1929) 40 F. 2d 70; *Leader Pub. Co.* v. *Grant Trust, etc., Co.*, (1915) 182 Ind. 651, 108 N. E. 121.

Thus, receipt of the Common Stock by the Corporations cannot be avoided on the ground that the Corporations did not directly receive the stock. Receipt by the Individuals became the Corporations' receipt under circumstances such as these where the Individuals were the sole shareholders, the officers, and the directors.

Even if receipt of the value of the Common Stock could not be attributed to the Corporations on the basis of agency or trust, it most certainly must be attributed as a receipt to the corporations under the long established doctrine of constructive receipt. This principle of the law of

taxation has been clearly and broadly defined to impose tax wherever there exists a right to receive income, whether availed of or not. A taxpayer is in constructive receipt of income if it is available to him without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is made. See *Blum* v. *Higgins*, (1945) 150 F. 2d 471 (C. C. A., N. Y.).

Further, there must be a present right to receive before the doctrine will be invoked. *Richard's Estate* v. *Commissioner of Internal Revenue*, (1945) 150 F. 2d 837.

The Indiana doctrine of constructive receipt is much the same. This may be seen by a careful reading of Burns' § 64-2601(h) and (i) and more specifically by Reg. 1007, Article 10, Regulations of the Gross Income Tax Division, which states:

> "*Whenever a party has a right to receive income* which would be taxable to him when received, he cannot escape taxability on account of such money being paid to another for his benefit." (Emphasis supplied.)

The Corporations had a right to receive the income for the assets which they transferred because the Corporations owned those assets. The affairs of any corporation, however, are conducted by people who act in dual capacities. The court recognized this mundane fact in *National Carbide Corporation* v. *Commissioner of Internal Revenue*, (1949) 336 U. S. 422, 69 S. Ct. 726, 93 L. Ed. 779:

> "Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually."

The Individuals, whether acting as sole shareholders, officers or directors, could well have so arranged the transaction that the Common Stock was transferred directly to the Corporations. In fact, they had a duty to do so. The Corporations,

therefore, had constructive receipt of income (Common Stock), because it should have been made available to them. However, the Corporations through the control of the Individuals chose to physically bypass the Corporations and transferred the Common Stock to the Individuals, much as was done by the taxpayer in *Michigan City News* v. *Dept. of Treasury*, (1945) 116 Ind. App. 40, 61 N. E. 2d 470. This court, in rejecting payment of a purchase price to an escrow agent, used the following language:

> "The fact that appellant made an arrangement whereby the purchaser paid the purchase price to an escrow agent, who in turn paid the proceeds of the transaction, except the amount paid on the mortgage, directly to the stockholders does not change the situation. The corporation in fact received $240,000.00 for the transfer of its property to the Purchaser. Certainly appellant would not seriously contend that if the Purchaser had paid this sum directly to it and it subsequently distributed this money to the stockholders, that it would not be taxable under the Gross Income Tax Law."

Not only is there constructive receipt of the Common Stock to the Corporations in that they had a right to receive the Common Stock, but a benefit was received by the Corporations. Appellant attempts to distinguish the *Michigan City News* case, *supra,* on the ground that the proceeds in that case were held for the seller corporation, whereas in the instant case there was no benefit to the Corporations. We reject this argument if for no other reason than that a benefit did accrue to the Corporations in that they avoided payment of Indiana gross income tax in the amount of $57,809.17.

Further, the Appellant's argument that no profit was intended to the Corporations does not affect the applicability of gross income tax. *Western Adjustment & Inspection Co.* v. *Gross Income Tax Div.,* (1957) 236 Ind. 639, 142 N. E. 2d 630. The Supreme Court of Indiana has found a benefit for purposes of Indiana gross income tax where the security or advantage of the taxpayer is added to,

or where he has been saved from expense or loss. *R. L. Shirmeyer, Inc.* v. *Indiana Rev. Bd.*, (1951) 229 Ind. 586, 99 N. E. 2d 847.

We pause here to consider another aspect of Appellants' argument. In order to avoid "receipt" by the Corporations, the ingenious proposition is forwarded that, in effect, the Individuals merely exchanged one proprietary interest for another in a reorganization and that by giving up substantially all their rights as stockholders they, in effect, exchanged stock for stock. Not only were there no gross receipts to the Corporations, but there was no gross income because the Individuals transferred their stock in the Corporations in exchange for the Common Stock. The rationale is that the Individuals as stockholders, while they did not physically transfer their stock certificates, had given up and transferred almost all their interest and rights as stockholders.

This is sophisticated argument indeed, but we must reject it in its entirety. First of all, it ignores the fact that the Individuals did not physically transfer their stock in the Corporations, and secondly, it ignores the fundamentals of separate corporate entity referred to above.

Carried to its logical conclusion, it leads them down the rocky path of "piercing their own corporate veil," with the result that the corporate assets are in their hands as "receipts," *i.e.*, they are taxed as individuals with receipt of the Common Stock.

There are cases interpreting the United States Internal Revenue Code which are applicable here to the effect that a taxpayer may not successfully question the separate corporate entity under which it has conducted its business. See *Carver* v. *United States*, (1969) 412 F. 2d 233; *National Carbide Corporation* v. *Commissioner of Internal Revenue*, (1949) 336 U. S. 422, 69 S. Ct. 726, 93 L. Ed. 779; and *Moline Properties, Inc.* v. *Commissioner of Internal Revenue*, (1943) 319 U. S. 436, 63 S. Ct. 1132, 87 L. Ed. 1499. These three cases

involved interpretations of the Internal Revenue Code in circumstances not dissimilar from the present case. Therefore we think these cases are applicable as authority for rejecting a taxpayer's argument that in effect ignores the separate existence of corporations which the taxpayer dominates.

(b) Having thus determined that the transaction under consideration constituted gross receipts to the Corporations, we now consider whether or not these gross receipts should be considered gross income as defined in the Act. We are of the opinion that they should be considered "gross income" within the meaning of subsection (m).

The definition of "gross income" used in the Gross Income Tax Act of 1933, I. C. 1971, Burns § 64-2601(m), reads, in relevant part, as follows:

> "The term 'gross income,' except as hereinafter otherwise expressly provided, means the gross receipts . . . received from the sale, transfer, or *exchange*, of property, tangible or intangible, real or personal, *including the sale of capital assets*, or from the assignment or sale of rights, *all receipts received from the performance of contracts. . . .*" (Emphasis supplied.)

The Act indicates that all gross receipts are not necessarily gross income. It is also true that unless the transaction comes within the provisions of the definition of "gross income," it cannot be taxed as gross income. *Dept. of Treasury* v. *Muessel,* (1941) 218 Ind. 250, 32 N. E. 2d 596.

We base our conclusion that the Corporations received gross income on these grounds:

1. The language of the Agreement itself can be construed as a sale of capital assets and rights rather than a reorganization. It says that *"Seller* agrees to convey, assign and transfer to Tennessee, and Tennessee agrees to acquire from the Seller . . . all of the properties and assets of the Seller of every kind and description, and its business as a going concern, together with, but not limited to, *cash, moneys on de-*

*posit, the goodwill of the business carried on by the Seller, including the right to the use of its name, trade names, brand names and trademarks, and all of its customers lists, credit and sales records...."* (Emphasis supplied.)

2. Subsection (m) provides that gross income shall include "the gross receipts received from the *sale, transfer, or exchange of property, ... including the sale of capital assets. ..."* (Emphasis supplied.) So it contemplates gross receipts from the exchange of property, including the sale of capital assets, as gross income, whether the property involved is a sale or an exchange of capital assets or other property.

3. Subsection (m) also specifically provides that gross income shall include "the gross receipts . . . received from the sale, transfer, or exchange, of property, . . . including the sale of capital assets, . . . [and] *all receipts received from the performance of contracts. ..."* (Emphasis supplied.) Appellants argue that the word "including" is a term of limitation and must be read to exclude transfers and exchanges of capital assets, citing *Dept. of Treasury* v. *Muessel, supra.* A fair reading of the statute must give weight to the use of the word "exchange" and the words "all receipts received from the performance of contracts." Read as a whole, the statute clearly intends to include as gross income reorganizations, sales, and exchanges of capital assets.

Furthermore, a sale did occur in this transaction inasmuch as the absolute title to the assets of the Corporations passed to Tennessee for a consideration which was constructively received by the Corporations. *Arnold* v. *North American Chemical Co.,* (1919) 232 Mass. 196, 122 N. E. 283. Also, Tennessee acquired not only the assets, but also certain rights of the Corporations, all of which constituted a sale of assets *within the meaning of the Act.*

Subsection (m) is broad enough to encompass the transaction with which we are concerned, whether the same be

regarded as a sale, reorganization, or exchange. The architects of the statute had reorganizations and mergers in mind as constituting receipt of gross income no matter how the taxpayer may turn and twist. The bald assertion by the Appellants that the transaction viewed as a whole is a reorganization or a merger does not take the transaction out of the terms of the statute which on its face contemplates taxing as gross income the proceeds received from such reorganizations or mergers. Thus we come to the inescapable conclusion that the transaction constituted gross receipts to the Corporations and those gross receipts come within the definition of gross income as set forth in subsections (h) and (m) of the Act.

Next we turn to the question of whether the gross income received by the Corporations is exempt under the terms of the Act.

*QUESTION II.* The Corporations did receive gross income which is not exempt within the meaning of Burns' § 64-2601 (m).

That portion of Burns' § 64-2601 (m) providing gross income which is exempt from taxation is as follows:

> "Provided further that *the term 'gross income' shall not include . . . the gross receipts represented by the value of stocks, bonds or other securities received in a reciprocal exchange by and between the owners thereof for other stocks,* bonds, or other securities or interests therein of which title is surrendered, *where such exchange is made in the course of a consolidation, merger, or reorganization, and the stocks,* bonds, *or other securities received in exchange are issued by one or more corporations* or associations, *each of which is a party to such reorganization.*" (Emphasis supplied.)

This statute sets forth four requirements that must be met to come within the exemption:

1. there must be an exchange of stocks, bonds, or other securities for other stocks, bonds, or securities or interests therein;

2. the exchange must be between the owners of the stocks, etc.;

3. the exchange must be made in the course of a corporate reorganization; and

4. each of the corporations issuing the stock exchanged must be a party to the reorganization.

Where an exemption is sought, as opposed to construction of the meaning or applicability of a tax statute, it has been consistently held that statutes will be strictly construed against the party claiming exemption. *Gross Income Tax Div.* v. *National Bank & Trust Co.*, (1948) 226 Ind. 293, 79 N. E. 2d 651.

We agree with the trial court that the transaction fails to come within the exemption.

Trying to fit this transaction into the four requirements of the exemption seems very much like trying to make a crab into a lobster without altering its shell. It cannot be done because:

1. *The transaction was not an exchange of stock for stock or interests therein, but clearly an exchange of corporate assets for stock.* In construing statutes, words and phrases will be given their plain, ordinary, and usual meaning, unless a different purpose is clearly manifest by the statute. *R. L. Shirmeyer, Inc.* v. *Indiana Rev. Bd.*, (1951) 229 Ind. 586, 99 N. E. 2d 847. Appellants argue that the stockholders, by virtue of their shares, had "an interest in" the corporate assets and as a consequence the transaction was, in reality, a stock-for-stock transaction. We do not agree. As earlier stated, stockholders have no in-interest in the property of a Corporation until the assets are distributed to them in dissolution. *Rhode Island Hospital Trust Co.* v. *Droughton, supra; Dept. of Treasury* v. *Crowder*, (1938) 214 Ind. 252, 15 N. E. 2d 89. The term "stock

for stock" means stock for stock, and under these circumstances an interest therein refers to an interest in the stock or securities and in no way reflects an intent of the legislature to ignore the existence of traditional concepts of separate corporate entity.

2. *The exchange was not between owners of the stock.* The Corporations did not "exchange" stock owned by each of them, but rather transferred assets. Further, Tennessee did not "exchange" its own stock, but rather stock of a separate and distinct entity, Cities Service Company.

Since this transaction fails to meet requirements number one and two of the exemption, we see no need to consider requirements three and four.

Appellants' specification of error concerning the exclusion of testimony as to the role of Cities Service Company in the transaction is of no avail because it concerns requirement number four.

Therefore the decision of the trial court is affirmed.

Sullivan, P.J., concurs; Lowdermilk and Robertson, JJ., concur.

NOTE.—Reported in 270 N. E. 2d 771.