Ronnie WINKLER, Appellant–
Plaintiff below,

v.

V.G. REED & SONS, INC., Arthur S. Over-
bay, Jr., and Typoservice Corporation,
Appellees–Defendants below.

No. 30S01–9407–CV–681.

Supreme Court of Indiana.

July 28, 1994.

Ronnie Winkler, Patrick N. Ryan, Marion, for appellant.

Susan L. Williams, Darryl W. Durham, Alagia, Day Trautwein & Smith, Louisville, KY, for V.G. Reed & Sons, Inc.

James A. Knauer, Marica E. Roan, Kroger Gardis & Regas, Indianapolis, for Arthur Overbay, Jr. and Typoservice Corp.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

Ronnie Winkler (Appellant–Plaintiff below) seeks transfer after the Court of Appeals affirmed the trial court's entry of summary judgment in favor of V.G. Reed & Sons, Inc., Arthur S. Overbay, Jr. and Typoservice Corporation (Appellees–Defendants below). *Winkler v. V.G. Reed & Sons* (1993), Ind. App., 619 N.E.2d 597.

### Facts

In 1989, Winkler entered into an employment contract to be the general manager of Typoservice, a printing and typesetting business. The contract was signed by Overbay, the president and majority shareholder of Typoservice. The agreement provided Winkler with an annual salary of $85,000 for fifteen years and entitled him to all the earnings remaining on the contract if his employment was severed for any reason other than mutual agreement or disability. The agreement also gave Winkler an option to purchase a majority of Typoservice stock if Overbay was no longer involved in the business.

In 1991, Overbay began negotiating with Reed & Sons, a Kentucky corporation engaged in the printing business, for the sale of Typoservice. The evidence shows that at this time, Typoservice was near insolvency because its primary lender had refused to renew outstanding loans of $2.2 million.

In July, 1991, Reed & Sons executed a Letter of Intent for the purchase of most of Typoservice's assets and the assumption of certain liabilities. Among other things, the Letter of Intent provided that Reed & Sons could designate the buyer of Typoservice's assets, and that the buyer would not assume any existing employment agreements but would assume the outstanding loans. Later, Typoservice and Reed & Sons executed an Asset Purchase Agreement that contained these same provisions. The Asset Purchase Agreement was later amended specifically to exclude Winkler's employment contract.

In September, 1991, Reed & Sons formed Midwest, Inc., as its wholly-owned subsidiary.[1] The Asset Purchase Agreement was again amended to reflect that Midwest was the designated buyer of the Typoservice assets. Midwest closed the transaction on October 1, 1991, after which Typoservice stopped all business activity. Winkler was discharged on October 9, 1991.

Winkler filed a three-count complaint against Reed & Sons, Overbay and Typoservice alleging that each had (1) breached the employment contract, (2) conspired to breach the employment contract, and (3) tortiously

---

1. Midwest is not a party to this lawsuit.

interfered with the employment contract. Defendants moved for summary judgment on all counts, except on the breach of contract claim against Typoservice.[2] Those motions were granted. Winkler appealed.

The Court of Appeals affirmed the entry of summary judgment. The court (1) declined to pierce the Typoservice corporate veil to hold Overbay individually liable because Overbay's actions were ones any corporate president could perform, 619 N.E.2d at 599; (2) found no evidence to support Winkler's contention that the transaction was a sale of stock rather than a sale of assets, *Id.* at 600; and (3) found no evidence to support Winkler's contention that the asset sale was other than a legitimate business transaction and thus, any interference with the employment contract as a result was justified. *Id.* at 601.

Winkler now seeks transfer. He asserts that (1) material issues of fact remain about whether Overbay is liable in an individual capacity for the breach of the employment contract and (2) the Court of Appeals erroneously decided that tortious interference with a contract can be excused or justified under these circumstances. We grant transfer to affirm the trial court and to elaborate on the well-reasoned opinion of the Court of Appeals which we summarily affirm.

### Standard of Review

■ This case was resolved below by summary judgment. Our standard of review is well-established. The reviewing court faces the same issues that were before the trial court and follows the same process. *Greathouse v. Armstrong* (1993), Ind., 616 N.E.2d 364, 366. The party appealing from the grant of summary judgment has the burden of persuading the court that the grant of summary judgment was erroneous. *Id.* The trial court's determination is carefully scrutinized to assure that the party against whom summary judgment was entered is not im-

properly prevented from having its day in court. *Id.*

Summary judgment is appropriate only if the pleadings and evidence sanctioned show "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Ind.Trial Rule 56(C). Even if the facts are undisputed, summary judgment is not proper if those undisputed facts give rise to conflicting inferences that are material. *Bochnowski v. Peoples Fed. Sav. & Loan* (1991), Ind., 571 N.E.2d 282, 285.

### Breach of Employment Contract

In Count I of the complaint, Winkler sought recovery from Overbay and Reed & Sons for breach of the employment agreement. We address the claims against each defendant separately.

*Overbay.* Winkler contends that Overbay is personally liable under the employment contract. Overbay responds that he cannot be liable for the breach of the contract because he signed the contract in his capacity as president of Typoservice.

■ The personal liability of corporate officers[3] and shareholders is determined by common law rules of agency. *Indiana Dept. of Pub. Welfare v. Chair Lance Serv.* (1988), Ind., 523 N.E.2d 1373, 1377. It is a matter of black-letter law that where the agent acted within the scope of the agent's authority in signing a contract on behalf of the principal, the remedy of one seeking to enforce the contract is against the principal and not the agent. *See, e.g., McHenry v. Duffield* (1844), 7 Blackf. 41, 42. As a result, corporate officers and shareholders are generally not personally liable for the contractual obligations of the corporation. *Toner v. Fulkerson* (1890), 125 Ind. 224, 225, 25 N.E. 218, 219.

■ These rules are derived from the fact that a corporation is a legal entity sepa-

---

**2.** Winkler's claim for breach of contract against Typoservice remains pending.

**3.** See Official comment to Ind.Code Ann. § 23–1–36–2 (1993) pertaining to the personal liability of corporate officers. Indiana Code § 23–1–26–3(b) (1993) states that "[u]nless otherwise provid-

ed in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation except that the shareholder may become personally liable by reason of the shareholder's own acts or conduct."

rate and distinct from its shareholders and officers. *Benner–Coryell Lumber Co. v. Indiana Unemployment Compensation Bd.* (1940), 218 Ind. 20, 25, 29 N.E.2d 776, 778, *cert. denied,* 312 U.S. 698, 61 S.Ct. 741, 85 L.Ed. 1132 (1941); *Clarke Auto Co. v. Fyffe* (1954), 124 Ind.App. 222, 227, 116 N.E.2d 532, 534. This has been so since the earliest days of our corporate law. In *Dartmouth College v. Woodward,* 17 U.S. (4 Wheat) 518, 4 L.Ed. 629 (1819), Chief Justice Marshall recognized that corporations had constitutionally protected contract rights. Thus, "[t]he corporate creature of the law—'invisible, intangible, and existing only in contemplation of law'—was endowed with basic legal rights, even against its creator." Bernard Schwartz, *Main Currents in American Legal Thought* 121 (1992) (quoting from *Dartmouth College,* 4 Wheat. at 636). Although a corporation acts only through its agents, officers, shareholders, and employees, it is the corporate entity that is legally responsible for those acts. *Chair Lance Serv.,* 523 N.E.2d at 1377.

Winkler concedes that the employment contract shows that Overbay signed it in his capacity as president of Typoservice, but contends that the corporate veil should be pierced because as the majority shareholder and president of Typoservice, Overbay was the sole decision-maker at Typoservice (including with respect to the transaction in question here), and he personally received the few assets not transferred in the sale to Midwest.

■ As the Court of Appeals correctly noted, Indiana courts are reluctant to disregard a corporate entity, but will do so to prevent fraud or unfairness to third parties. *Magic Packing Co. v. Stone–Ordean* (1902), 158 Ind. 538, 541, 64 N.E. 11, 12; *Gurnik v. Lee* (1992), Ind.App., 587 N.E.2d 706, 710. The burden is on the party seeking to pierce the corporate veil, *Hinds v. McNair* (1955), 235 Ind. 34, 41, 129 N.E.2d 553, 559, to establish "that the corporation was so ignored, controlled or manipulated that it was merely the instrumentality of another, and that the misuse of the corporate form would constitute a fraud or promote injustice." *Gurnik,* 587 N.E.2d at 710.

■ When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry. *Hinds,* 235 Ind. at 41–48, 129 N.E.2d at 559–561. As a general statement, the factors to be considered include whether the corporate form has been adhered to, whether corporate assets are treated as such or as personal assets, and whether there has been an attempt to deceive third parties. *See Hinds,* 235 Ind. at 40–41, 129 N.E.2d at 560; *Magic Packing,* 158 Ind. at 541, 64 N.E. at 12; *Lambert v. Farmers Bank* (1988), Ind.App., 519 N.E.2d 745, 748; *Extra Energy Coal Co. v. Diamond Energy* (1984), Ind.App., 467 N.E.2d 439, 441–42.[4]

■ The facts here are not disputed. The contract shows Overbay signed it in his capacity as president. There is no evidence that he treated Typoservice as his alter ego or that Winkler was deceived about the identity of his employer. Even if, as Winkler asserts, Overbay improperly received the few

---

4. Different considerations apply in the context of tax law where exceptions to the doctrine of separate corporate identity more often arise. *See, e.g., Mobil Oil Corp. v. Comm'r of Taxes,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). In *Mobil Oil,* Vermont sought to tax dividends received from subsidiaries and affiliates doing business abroad; none of the subsidiaries or affiliates did business in Vermont. The Supreme Court found the dividends apportionable to Vermont, rejecting Mobil's corporate-form argument:

One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability.

Superficially, intercorporate division might appear to be a more attractive basis for limiting apportionability. But the form of business organization may have nothing to do with the underlying unity or diversity of business enterprise. Had [Mobil] chosen to operate its foreign subsidiaries as separate divisions of a legally as well as a functionally integrated enterprise, there is little doubt that the income derived from those divisions would meet due process requirements for apportionability. Transforming the same income into dividends from legally separate entities works no change in the underlying economic realities of a unitary business, and accordingly it ought not to affect the apportionability of the income the parent receives.

445 U.S. at 440, 100 S.Ct. at 1233 (citations and footnote omitted).

assets that remained after the sale to Midwest, that fact is insufficient to support holding Overbay personally liable under the employment contract.[5] *See Mishawaka Brass Mfg. v. Milwaukee Valve Co.* (1983), Ind. App., 444 N.E.2d 855 (sole shareholder of predecessor corporation, who purchased equipment of predecessor corporation and leased it back for business purpose, not subject of individual liability because there was no intent to defraud). These facts simply do not give rise to the inference that Winkler acted other than as an agent for the corporation. The Court of Appeals correctly affirmed the trial court's entry of summary judgment against Winkler because he has failed to set forth specific facts showing a genuine issue for trial.

***Reed & Sons.*** Winkler offers three theories for subjecting Reed & Sons to liability under a contract to which it was not a party, none of which we resolve in his favor.

■ First, Winkler asserts that the sale of assets was really a sale of stock, which passed on sale to the purchaser, Midwest, Inc. Where a corporation's stock is sold, all liabilities of that corporation remain with that corporation. 15 *Stephen M. Flanagan et al., Fletcher Cyclopedia of the Law of Private Corporations* § 7122 (1990); *Markham v. Prutsman Mirror Co.* (1991), Ind. App., 565 N.E.2d 385, 386–7 (citing *Polius v. Clark Equipment Co.*, 802 F.2d 75, 77 (3d Cir.1986)).

■ By contrast, where one corporation purchases the assets of another, the buyer does not assume the debts and liabilities of the seller. *Markham,* 565 N.E.2d at 387; *Fletcher Cyclopedia* § 7122. Generally recognized exceptions to this rule include (1) an implied or express agreement to assume the

obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a de facto consolidation or merger; or (4) instances where the purchaser is a mere continuation of the seller. *Id.*

■ The Asset Purchase Agreement provided in pertinent part: "Buyer shall not assume or be liable for any liability or obligation of Seller arising out of … Any and all agreements of employment between the Company and any of its employees, including but not limited to any such agreements with Ron Winkler." Clearly, Midwest chose not to include the employment contract as a part of the sales transaction. Winkler's assertions notwithstanding, there is no evidence of fraud in the transaction. As the Court of Appeals observed, "The conclusion that Midwest did not assume liability for any breach of Winkler's employment agreement is inescapable." 619 N.E.2d at 600.

■ The essence of Winkler's second argument is that the conduct of the parties amounted to a novation.[6] Winkler argues that Reed & Sons, acting through Midwest, Inc., became bound by the employment contract because Winkler continued to work for a short period of time after the asset sale took place.

■ To effect a novation requires (1) a valid existing contract, (2) the agreement of all parties to a new contract, (3) a valid new contract, and (4) an extinguishment of the old contract in favor of the new one. *Morris v. Whitmore* (1866), 27 Ind. 418, 420; *Boswell v. Lyon,* (1980), Ind.App., 401 N.E.2d 735, 741. A novation may not be achieved unilaterally. *Naven v. Colonial Hotel* (1950), 228 Ind. 128, 134, 90 N.E.2d 128, 130–31. The agreement may be express, *White Truck Sales of India-*

---

5. Distribution of the remaining assets of Typoservice may be relevant for purposes of determining whether Typoservice has assets with which to pay a judgment, if any, entered against it for the breach of contract. Ind.Code § 23–1–28–3 (1993). *See also Rhode Island Hosp. Trust Co. v. Doughton,* 270 U.S. 69, 82, 46 S.Ct. 256, 259, 70 L.Ed. 475 (1926); *Madding v. Indiana Dept. of State Revenue* (1971), 149 Ind.App. 74, 84, 270 N.E.2d 771, 777 (shareholder is entitled to his share of corporate assets only after the debts and liabilities have been satisfied and the assets have been distributed in liquidation).

6. Winkler actually uses the word "ratification," but that contract principle is inapplicable here. Ratification applies when a party to a contract, with knowledge of facts entitling that party to rescind the contract, treats the contract as a continuing and valid obligation, thus leading the other party to believe that the contract is still in effect. *Miller v. Ortman* (1956), 235 Ind. 641, 682, 136 N.E.2d 17, 37.

napolis v. Shelby Nat'l Bank (1981), Ind. App., 420 N.E.2d 1266, 1271, or implied. Rose Acre Farms, Inc. v. Cone (1986), Ind. App., 492 N.E.2d 61, 69, trans. denied.

■ The Asset Purchase Agreement explicitly provided that Midwest had not agreed to be bound by the employment agreement. The fact that Winkler worked for a short time after the asset sale took place is, standing alone, insufficient to raise the inference that Midwest had agreed to enter into a new employment contract with Winkler.

■ Third, Winkler asserts that we should pierce the corporate veil of Midwest because it is a wholly-owned subsidiary of Reed & Sons. Just as equity permits the piercing of a corporate veil to reach the assets of an individual, so too equity permits the piercing of the subsidiary's corporate veil to reach the assets of the parent to protect innocent third parties from fraud or injustice. See, e.g., Stacey–Rand Inc. v. J.J. Holman, Inc. (1988), Ind.App., 527 N.E.2d 726, 728. However, Indiana courts are extremely reluctant to disregard corporate identity and certainly the mere fact of a subsidiary-parent relationship is not, without more, sufficient reason to pierce the corporate veil. Here, Winkler has presented no evidence from which we can infer that the corporate veil of Midwest as the subsidiary of Reed & Sons should be pierced.

### Conspiracy and Tortious Interference

■ Count II of the complaint alleges that Typoservice, Overbay and Reed & Sons conspired to breach Winkler's employment contract. Count III alleges that the defendants tortiously interfered with the employment contract. As did the Court of Appeals, we address both counts together because civil conspiracy is not an independent cause of action. Indianapolis Horse Patrol, Inc. v. Ward (1966), 247 Ind. 519, 522, 217 N.E.2d 626, 628.[7]

■ Indiana has long recognized that intentional interference with a contract is an actionable tort, and includes any intentional, unjustified interference by third parties with an employment contract. Bochnowski v. Peoples Fed. Sav. & Loan (1991), Ind., 571 N.E.2d 282, 284. The tort reflects the public policy that contract rights are property, and under proper circumstances, are entitled to enforcement and protection from those who tortiously interfere with those rights. See Miller v. Ortman (1956), 235 Ind. 641, 670, 136 N.E.2d 17, 34.

In Indiana, the tort appears to have evolved from judicial loathing of conspiracies in restraint of free enterprise by trade associations. See, e.g., Jackson v. Stanfield (1893), 137 Ind. 592, 36 N.E. 345 (lumber association liable to independent retailer when association influenced wholesalers not to deal with retailer, thereby preventing the retailer from fulfilling a favorable order from Studebaker Corporation); Fort Wayne

---

7. As a preliminary matter, we address the arguments of Overbay and Typoservice that they cannot be subject to liability for tortious interference with the employment contract. Overbay correctly argues that he cannot be subject to personal liability for tortious interference with the contract because the uncontested evidence showed that he negotiated the asset purchase agreement as an officer of Typoservice, not in his individual capacity. A corporate officer is not liable for inducing the corporation's breach of its contract if the officer acts within the scope of his official duties on behalf of the corporation and not as an individual for his own advantage. Martin v. Platt (1979), 179 Ind.App. 688, 691, 386 N.E.2d 1026, 1027 (discharge of employees was within the scope of officer's duties, even if discharge violated employees' employment contract); Kiyose v. Trustees of Indiana Univ. (1975), 166 Ind.App. 34, 44, 333 N.E.2d 886, 891 (officers who gave assurances that professor would have lifetime employment were not subject to personal liability when professor was discharged). See also Thomas G. Fischer, Annotation, Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another, 72 A.L.R.4th 492 (1989).

On the other hand, we reject Typoservice's argument that it escapes liability because one cannot tortiously interfere with its own contract. Although it is true that a party to a contract is not subject to liability for tortious interference with its own contract if it acts alone, Kiyose, 166 Ind.App. at 44, 333 N.E.2d at 891, it may be subject to liability for conspiring with another party to tortiously interfere with the contract. Wade v. Culp (1939), 107 Ind.App. 503, 508, 23 N.E.2d 615, 617, trans. denied. Thus, the Court of Appeals correctly observed that Typoservice may not avoid liability merely because it was a party to the contract.

*Cleaners & Dyers Ass'n v. Price* (1956), 127 Ind.App. 13, 137 N.E.2d 738 (association of dry cleaners enjoined from fixing prices for the dry cleaning business and from interfering with plaintiff independent dry cleaner's employees). The absence of "justification" for the conduct of the trade associations in these cases was eventually incorporated as an element necessary to establish the tort in more routine contractual disputes. *E.g., Helvey v. O'Neill* (1972), 153 Ind.App. 635, 645, 288 N.E.2d 553, 559.

■ In *Daily v. Nau* (1975), 167 Ind.App. 541, 339 N.E.2d 71, Judge Staton clearly enunciated for the first time the now-familiar five elements necessary for recovery for tortious interference with a contractual relationship: (i) existence of a valid and enforceable contract; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional inducement of breach of the contract; (iv) the absence of justification; and (v) damages resulting from defendant's wrongful inducement of the breach. *Id.* at 549 n. 6, 399 N.E.2d at 76 n. 6.

■ In summary judgment proceedings, the burden is on the moving party to prove the non-existence of a genuine issue of material fact. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190. Movants may meet this burden by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim. *Moore v. Sitzmark Corp.* (1990), Ind.App., 555 N.E.2d 1305, 1307. If the movant sustains this burden, the opponent may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. T.R. 56(E).

■ We agree with the trial court, as did the Court of Appeals, that the undisputed facts demonstrate the absence of element (iv). That is, there is no genuine issue of material fact about whether the defendants here acted with justification. They did.

In determining whether a defendant's conduct in intentionally interfering with a contract is justified or not, the *Restatement* suggests that the following factors be considered:

(a) the nature of the defendant's conduct;

(b) the defendant's motive;

(c) the interests of the plaintiff with which the defendant's conduct interferes;

(d) the interests sought to be advanced by the defendant;

(e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f) the proximity or remoteness of the defendant's conduct to the interference; and

(g) the relations between the parties.

*Restatement (Second) of Torts* § 767 (1977). Other courts have considered these factors. *See, e.g. Bendix Corp. v. Adams*, 610 P.2d 24, 30 (Ala.1980); *Snow v. Western Sav. & Loan Ass'n*, 152 Ariz. 27, 730 P.2d 204, 212 (1986); *Swager v. Couri*, 77 Ill.2d 173, 32 Ill.Dec. 540, 547, 395 N.E.2d 921, 928 (1979); *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1115 (1986); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 21 (1990); *Morrow v. FBS Ins.*, 236 Mont. 394, 770 P.2d 859 (1989). As the comments to § 767 indicate, the weight to be given to each consideration may differ from case to case depending upon the factual circumstances, but the overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances. *Id.,* § 767, cmt. j.

We begin our analysis with the observation that Winkler makes no contention that defendants' conduct was *malum in se*. *Compare Bochnowski v. Peoples*, 571 N.E.2d at 285 (attempt to force settlement of litigation by inducing a litigant to terminate an employee does not constitute a legitimate business purpose which would justify interference with appellant's employment contract) and *Miller v. Ortman* (1956), 235 Ind. 641, 136 N.E.2d 17 (defendant's commission of illegal acts causing others to breach their contracts with plaintiff-distributor is not justified). Winkler does not contend that defendants made any misrepresentations, applied unfair economic pressure, or threatened litigation which induced Typoservice to breach its contract with him.

Winkler also does not suggest that defendants' motive was a willful or spiteful intent to injure him. In fact, the evidence is undisputed that Typoservice sold its business assets because it was in serious financial trouble, and that Midwest purchased the assets because its parent company, Reed & Sons, believed it could return the enterprise to profitability. Although Winkler's interest in continued employment under the contract is certainly entitled to protection, contract law provides those protections. Assuming that Typoservice has breached Winkler's employment contract, it was within its right to do so subject to its responsibility to pay compensatory damages due under the contract. *Miller Brewing Co. v. Best Beers of Bloomington* (1993), Ind., 608 N.E.2d 975, 984, *reh'g denied.*

Winkler gives, and we perceive, no reasons why his contract interests should receive greater protection in tort law than the business interests sought to be advanced by defendants here, namely, acquiring the Typoservice business and attempting to put it on a sound financial footing. *See Neterer v. Slabaugh* (1990), Ind.App., 548 N.E.2d 832, 833, *trans. denied* (manager not liable for interference with owner's contract where cause of breach was not manager's activities, but promissor's impending bankruptcy). *See also Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1126–28 (6th Cir.1981), *reh'g denied,* 668 F.2d 878 (1982), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). In *Heheman,* printers sued two newspaper publishers for tortious interference with an employment contract that guaranteed lifetime employment for the printers. Following a partial reorganization and merger between the publishers, the workers covered by the agreement were terminated. Summary judgment against the workers was affirmed because there was no evidence that the second publisher's negotiation of a joint operation agreement was motivated by spite or ill will against the printers, with whom it had never dealt. We perceive no reasonable argument that, given the legitimate business intent of Typoservice and Reed & Sons in engaging in the sales transaction, any tort was committed.

Although public policy concerns do not dictate that there be a totally free and unrestrained ability to purchase and sell businesses without regard to pre-existing employment contracts, Winkler offers no reasons why such interests in the free purchase and sale of businesses are outweighed by policy considerations in maintaining his contract here. In instances where there is a good-faith purchase of a business, the justification necessary to avoid tort liability for altering existing employment contract will usually be present. Of course, the injured party will be left with contract remedies.

### Conclusion

Accordingly, we grant transfer and affirm the entry of summary judgment in favor of Overbay, Typoservice and Reed & Sons. Winkler's breach of contract claim against Typoservice remains pending.

SHEPARD, C.J. and GIVAN and DICKSON, JJ., concur.

DeBRULER, J., concurs in result.