In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1390

DONALD A. BREGIN,

*Plaintiff-Appellant,*

*v.*

LIQUIDEBT SYSTEMS, INC. and SIRVA, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:06-CV-23—**Theresa L. Springmann,** *Judge.*

ARGUED SEPTEMBER 25, 2008—DECIDED NOVEMBER 19, 2008

Before POSNER, FLAUM, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* After Donald A. Bregin was discharged from his employment at Liquidebt Systems, Inc. (LSI) he filed this lawsuit, contending that his discharge was in retaliation for his refusal to participate in illegal accounting practices or, alternatively, for being a whistle-blower, and that SIRVA, Inc. (in conspiracy with LSI) tortiously interfered with his employment. The district court granted summary judgment for both

companies, and Bregin appeals. Our review is *de novo*. *Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673 (7th Cir. 2001).

SIRVA provides relocation and moving services; North American Van Lines, Inc. (NAVL) is its subsidiary. Until the late 1990s Bregin worked at NAVL doing, primarily, the collecting of accounts receivable. He than was a subcontractor for LSI and, later, he worked as a consultant for SIRVA. At SIRVA his job was to identify ways SIRVA could improve its collections procedures. Near the end of his time as a consultant, he provided a "To-Do List" for SIRVA. In preparing the list he reported that internal financial documents were incorrect in that SIRVA included, in accounts receivable, money that should have been refunded to customers.

Also during this period NAVL decided to outsource its collection efforts. At this point LSI entered the picture. It negotiated with NAVL to provide collection services. As a consultant to NAVL's parent, SIRVA, Bregin was involved in the negotiations that resulted in a contract between NAVL and LSI, which the parties refer to as the LSI/SIRVA contract. Bregin was also involved in determining the benchmark for evaluating LSI's performance under the contract.

LSI expressed an interest in hiring Bregin to oversee the SIRVA account. SIRVA liked the idea because of Bregin's familiarity with SIRVA and its employees. So it happened that Bregin became LSI's vice-president of operations and was considered the project manager on the SIRVA account. He no longer had an employment relationship of any kind with SIRVA or NAVL.

As part of LSI's responsibility for collecting SIRVA's outstanding customer accounts, LSI employees were to contact SIRVA's customers as soon as an invoice was past due. Payments were made directly to SIRVA. LSI was not involved in either calculating SIRVA's accounts or handling refunds and credits.

To evaluate LSI's performance, SIRVA measured how quickly receivables were collected, referred to as the days sales billed (DSB). Under the contract, LSI's performance goal—or "benchmark"—was to improve collection of SIRVA's accounts receivable by 10 percent during 2003. The 2003 DSB would be compared to the 2002 DSB to see whether LSI met the benchmark. The maximum incentive for LSI to exceed the benchmark was a payment of $150,000; the maximum penalty for failing to meet it was also $150,000.

SIRVA regularly reviewed LSI's performance. During the spring and summer of 2003, LSI failed to lower the DSB, causing officials at SIRVA to express concern about the job LSI was doing. Bregin believed that because of certain accounting practices (for instance, including customer overpayments in accounts receivable), the DSB did not accurately reflect LSI's performance. Bregin did not think the numbers for the two years—2002 and 2003—were comparable and believed that the manner in which the 2003 figures were calculated made it impossible for LSI to improve its performance. He repeatedly discussed his concerns with James Drolshagen, the president and sole shareholder of LSI, and with Tom McKenna, LSI's director of client relations. Bregin requested

that SIRVA recalculate the DSB. Throughout this time period, SIRVA continued to doubt whether LSI could meet the contract goals, and Bregin continued to believe that it was SIRVA's accounting that created a perception that LSI was not performing adequately.

In the fall, it became clear to Drolshagen that LSI was not meeting its performance goals under Bregin's leadership. He called it a "monumental failure." But because Bregin continued to blame the problem on SIRVA's treatment of its accounts receivable, Drolshagen asked McKenna to independently evaluate Bregin's complaints. If McKenna found that the complaints were well-founded, Drolshagen intended to demand relief from the penalty provisions in the contract. But, instead, what McKenna concluded was that LSI's performance was so poor that the company would be subject to a penalty even if SIRVA made the changes Bregin requested.

In November 2003, Drolshagen removed Bregin from the SIRVA account but kept him on the payroll at $110,000 per year. Drolshagen told Bregin that if "he could bring in some customers for us, that would be a way of him maintaining his position." Bregin failed to draw in new clients, and in December his employment was terminated. LSI did not meet the benchmark in 2003 and was assessed the $150,000 penalty.

Bregin filed this lawsuit under Indiana law, contending, in part, that LSI terminated his employment in retaliation for his reporting SIRVA's illegal financial practices, for refusing to engage in those practices, or for being a whistle-blower. Given the undisputed facts, the claim must fail.

Recently, the Indiana Supreme Court reaffirmed the Indiana employment-at-will doctrine which "permits both the employer and the employee to terminate the employment at any time for a 'good reason, bad reason, or no reason at all.'" *Meyers v. Meyers*, 861 N.E.2d 704, 706 (Ind. 2007), quoting *Montgomery v. Bd. of Trustees of Purdue Univ.*, 849 N.E.2d 1120, 1128 (Ind. 2006). The court stated that on "rare occasions, narrow exceptions have been recognized." *Meyers*, at 706. On one "rare" occasion a "narrow" exception was found in *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390 (Ind. 1988). McClanahan was a truck driver who was permitted to pursue a cause of action against an employer who fired him for refusing to haul a load that exceeded the weight limits on Illinois highways. He could have been personally liable for a violation. A narrow exception to at-will employment was recognized in that case to avoid encouraging criminal conduct. A second exception is set out in *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973). The court found a cause of action for retaliatory discharge based on explicit language in a statute—the Indiana Worker's Compensation Act. The court said that "under ordinary circumstances, an employee at will may be discharged without cause. However, when an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule must be recognized." At 428. The narrowness of this exception was made clear, however, in *Wior v. Anchor Industries, Inc.*, 669 N.E.2d 172 (Ind. 1996), when the court refused to allow a claim brought by a manager who was terminated for refusing to follow a supervisor's

order to fire an employee who filed a worker's compensation claim.

Bregin acknowledges that he has no statutory basis for his claim; he relies on the exception in *McClanahan*—that he was fired for refusing to commit an illegal act for which he could be personally responsible. He seems to contend that SIRVA's accounting practices were illegal and that he could not lawfully stay silent about them. In an affidavit, he refers to "financial mismanagement," "overstating income," and "failure to pay customer refunds and overpayments." But he does not offer specifics. And he does not identify any illegal act which he is being asked to commit—or for that matter to condone. What he says is that

> [t]here are numerous laws governing tax returns, securities, banking, conspiracy, and abandoned property that SIRVA may have violated. Appellant directly or indirectly, would have been facilitating these acts in his role at LSI and, thus, personally liable.

His major complaint involves the way the benchmark data was calculated. But the benchmark data is specific to the contract, and Bregin does not explain how these calculations have significance to, say, tax or securities laws. Furthermore, he admitted in his deposition that he was never in a position where he was required to authenticate or verify any of SIRVA's financial statements. Given Indiana's reluctance to allow for even rare and narrow exceptions, we would be far out of line to find that some speculative accounting violation on SIRVA's part, for which Bregin had no responsibility, could qualify as an exception to Indiana's employment-at-will doctrine.

Undeterred, Bregin also urges us to find a new exception. He says that he is a "whistle blower" and that "as a 'whistle blower' under 18 U.S.C. § 1514A [the Sarbanes-Oxley Act], he was afforded certain protections against wrongful discharged [sic] under state law." In a footnote he explains that he did not file a claim under Sarbanes-Oxley and is not claiming that he is protected under the administrative scheme set out in the Act. What he claims is that he "nevertheless is protected under the Whistle Blower Act as a person that cannot be retaliated against under state law." On the other hand, he also says, quite correctly, that in Indiana whistle-blowers "are not included in the public policy exception to at-will terminations . . . ." His argument is that they "should be." This case, he says, should establish such protection.

We cannot agree. As we just discussed, Bregin does not pinpoint any law that has been violated. He says because SIRVA was in the process of issuing an initial public offering (IPO), the company did not want any irregularities to come to light. But, again, the irregularities he is talking about are vague. We cannot conclude that, contrary to what the Indiana courts have repeatedly said, they would now decide—especially based on the facts before us—that whistle-blowing is an exception to the employment-at-will doctrine. That they would not is clear from *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054 (Ind. App. 1980). In that case the court rejected a claim by an employee who was terminated after complaining to his superiors about a drug manufacturer's failure to acknowledge that its products caused adverse reactions. A lengthy dissent vigorously sets forth the case for

allowing an exception to the employment-at-will doctrine for whistle-blowers. But that view did not carry the day. At this time, whistle-blowing simply does not form the basis for an exception to Indiana's employment-at-will doctrine.

Bregin also claims that SIRVA tortiously interfered with his employment at LSI. He says SIRVA and LSI conspired to terminate him because of his constant reporting that the SIRVA accounting practices were illegal. We will begin our discussion with the few things that are clear about this claim: one is the elements of the claim under Indiana law. They are

> (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship.

*Bradley v. Hall*, 720 N.E.2d 747, 750 (Ind. App. 1999). Also, under Indiana law a party to a contract can conspire with another to tortiously interfere with the contractual relationship. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994). It is clear that Bregin meets the first two elements of a tortious interference claim. He had an employment relationship with LSI, and SIRVA knew it. Beyond that, it is difficult to articulate exactly what Bregin is claiming and even more difficult to determine exactly what evidence he is relying on to support his claim.

He seems to say that *after* he was removed from the SIRVA account, SIRVA pressured LSI to terminate his

employment to "silence" him. SIRVA allegedly wanted him silenced so that he would not somehow jinx SIRVA's IPO. But, as we have said, it is entirely unclear exactly what Bregin knew that would have an effect on the IPO. Furthermore, it is hard to see how terminating his employment would silence him. It could have quite the opposite effect. Neither can it be said that terminating his employment would cut him off from information about what was going on at SIRVA. He was, after all, already off the SIRVA account.

Bregin also sees shenanigans somehow involved in the $150,000 penalty and the way it was paid—or not paid. Here is Bregin's argument on this point—word-for-word, bracket-by-bracket:

> Under the Contract, Appellant has presented evidence in support of his argument that SIRVA conspired with LSI "under the guise of enforcing the penalty clause of the contract and through manipulation of the numbers and scheme by SIRVA alleging poor performance while actually rewarding LSI with additional cash every month in fees". [R. 92] S. App. 2.

> Bregin contends that Drolshagen terminated four other employees as a cost saving measure to offset the penalty. The terminations saved in excess of $350,000 and thus were not necessary to pay the penalty, and were simply a "perpetuat[ion] of the conspiracy." [R.92] S. App. 2. The increase contract fees were received five (5) days later, after Bregin's removal shows SIRVA's influence over LSI to terminate Bregin's employment.

We must admit that we are not sure what Bregin means. Does Bregin claim that LSI fired four employees in addition to him to facilitate the conspiracy? If so, what is the proof? We have nothing but Bregin's conjecture. Not for the first time, we decline to construct a party's argument. *See Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392 (7th Cir. 2000).

The one salient fact in the record relevant to the claim of tortious interference is that Drolshagen (who, we repeat, is LSI's president) testified that no one at SIRVA requested that Bregin be removed from its account, much less that he be fired. Drolshagen said that he, and only he, made the decision to terminate Bregin's employment.

Finally, even though Bregin has shown that SIRVA complained about him to LSI, he cannot show that the complaint was unjustified. Indiana courts look to a number of factors to determine whether a defendant's conduct is justified, one of which is the defendant's motive. *Winkler*, 638 N.E.2d at 1235. Here, the evidence shows that LSI was not meeting the established goals under the contract. SIRVA had concerns about LSI's attentiveness, lack of leadership, poor work product, and unprofessional conduct. For instance, SIRVA's Anne Loesch, who was manager of the SIRVA/LSI relationship, had trouble getting information and responses from Bregin. Bregin himself understood that Loesch's perception was that LSI managers did not have a sense of urgency about the account. A complaint to LSI under those circumstances would be justified. For all these reasons, the claim of tortious interference cannot stand.

Accordingly, the decision of the district court is AFFIRMED.